No. 3--04--0271
(Consolidated with Nos. 3--04--0285 and 3--04--0289)

Filed December 4, 2009–CORRECTED COPY 1/26/10

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2009

| | | |
|---|---|---|
| COUNTY OF KANKAKEE, ILLINOIS, EDWARD D. SMITH, KANKAKEE COUNTY STATE'S ATTORNEY, WASTE MANAGEMENT OF ILLINOIS, INC., and BYRON SANDBERG, | ) ) ) ) ) ) | Appeal from the Illinois Pollution Control Board |
| Petitioners-Appellants, | ) ) | |
| | ) | Docket Nos.  PCB 04--33 |
| v. | ) | PCB 04--34 |
| | ) | PCB 04--35 |
| THE ILLINOIS POLLUTION CONTROL BOARD, THE CITY OF KANKAKEE, ILLINOIS, TOWN & COUNTRY UTILITIES, INC., and KANKAKEE REGIONAL LANDFILL, LLC, | ) ) ) ) ) ) | |
| Respondents-Appellees. | ) | |

JUSTICE McDADE delivered the opinion of the court:

For convenience and clarity, this opinion uses the following short-form references: Town & Country Utilities, Inc. (Town & Country); Town & Country and Kankakee Regional Landfill, LLC, collectively (Applicants); the County of Kankakee, Illinois (County); Waste Management of Illinois, Inc. (Waste Management); Byron Sandberg (Sandberg); the County, Waste Management, and Sandberg collectively (Objectors); the City of Kankakee, Illinois (City); the city council of the City of Kankakee (City Council or Council); the Illinois Pollution Control

Board (Board); and the Illinois Environmental Protection Act (Act) (415 ILCS 5/1 *et seq.* (West 2004)).

Following an unsuccessful request, Applicants filed a second request seeking local siting approval for a proposed landfill within the City. A lengthy hearing ensued, whereupon the City Council approved the request. Objectors petitioned for review before the Board, which upheld the City Council's decision. Objectors then filed the instant appeal challenging the approval of Applicants' second request on several grounds.

RELEVANT STATUTORY PROVISIONS

Subsection 39(c)) of the Act declares that "no permit for the development or construction of a new pollution control facility may be granted by the [Environmental Protection] Agency unless the applicant submits proof to the Agency that the location of the facility has been approved by the *** governing body of the municipality *** in which the facility is to be located in accordance with Section 39.2 of this Act." 415 ILCS 5/39(c)) (West 2004). In relevant part, section 39.2 reads:

> "(a) The *** governing body of the municipality *** shall approve or disapprove the request for local siting approval for each pollution control facility which is subject to such review. An applicant for local siting approval shall submit sufficient details describing the proposed facility to demonstrate compliance, and local siting approval shall be granted only if the proposed facility meets the following criteria:
>
> ***
>
> (ii) the facility is so designed, located and proposed to be operated that the public health, safety and welfare will be protected;

2

***

(iv) *** (B) for a facility that is a sanitary landfill or waste disposal site, the facility is located outside the boundary of the 100-year floodplain ***;

* * *

(viii) if the facility is to be located in a county where the county board has adopted a solid waste management plan consistent with the planning requirements of the Local Solid Waste Disposal Act or the Solid Waste Planning and Recycling Act, the facility is consistent with that plan[.] ***

* * *

(b) No later than 14 days before the date on which the *** governing body of the municipality receives a request for site approval, the applicant shall cause written notice of such request to be served either in person or by registered mail, return receipt requested, on the owners of all property within the subject area not solely owned by the applicant, and on the owners of all property within 250 feet in each direction of the lot line of the subject property, said owners being such persons or entities which appear from the authentic tax records of the County in which such facility is to be located ***.

***

Such notice shall state the name and address of the applicant, the location of the proposed site, the nature and size of the development, the nature of the activity proposed, the probable life of the proposed activity, the date when the request for site approval will be submitted, and a description of the right of persons to comment on such request as hereafter provided.

(c) An applicant shall file a copy of its request with the *** governing body of the municipality in which the proposed site is located. The request shall include (i) the substance of the applicant's proposal and (ii) all documents, if any, submitted as of that date to the [Environmental Protection] Agency pertaining to the proposed facility, except trade secrets as determined under Section 7.1 of this Act. All such documents or other materials on file with the *** governing body of the municipality shall be made available for public inspection at the office of the *** governing body of the municipality and may be copied upon payment of the actual cost of reproduction.

Any person may file written comment with the *** governing body of the municipality concerning the appropriateness of the proposed site for its intended purpose. The *** governing body of the municipality shall consider any comment received or postmarked not later than 30 days after the date of the last public hearing.

* * *

(m) An applicant may not file a request for local siting approval which is substantially the same as a request which was disapproved pursuant to a finding against the applicant under any of criteria (i) through (ix) of subsection (a) of this Section within the preceding 2 years." 415 ILCS 5/39.2(a)(ii), (a)(iv), (a)(viii), (b), (c), (m) (West 2004).

If the governing body of a municipality grants a request for local siting approval, a third party may petition the Board for a hearing to contest the decision, "such hearing to be based exclusively on the record before *** the governing body of the municipality." 415 ILCS 5/40.1(b) (West 2004). In making its determination, "the Board shall include in its consideration *** the fundamental fairness of the procedures used by the *** governing body of the

4

municipality." 415 ILCS 5/40.1(a) (West 2004).

PROCEDURAL FACTS

1. The 2002 Request

On March 13, 2002, Applicants filed a request with the City for local siting approval of a proposed landfill. Objectors opposed the request, but the City Council approved it after conducting a multi-day hearing. Objectors then petitioned for review before the Board, which reversed the City Council's decision. Specifically, the Board concluded that the Council erred in finding that the proposed landfill met the criterion in subsection 39.2(a)(ii) of the Act (415 ILCS 5/39.2(a)(ii) (West 2002) (protection of public health, safety, and welfare)).

Applicants appealed to this Court (Town & Country Utilities, Inc. v. Pollution Control Board, No. 3-03-0025 (unpublished order under Supreme Court Rule 23)) (Town & Country I), and we reinstated the City Council's decision. The County and Board then appealed to the Illinois Supreme Court, which held that: (1) the decision to be reviewed was the decision issued by the Board, not the Council; and (2) the Board's decision was not against the manifest weight of the evidence. Town & Country Utilities, Inc. v. Pollution Control Board, 225 Ill. 2d 103, 122 (2007). Accordingly, the Board's decision was reinstated and Applicants' 2002 siting request failed.

2. The 2003 Request

On March 7, 2003, before their appeal to this court in Town & Country I, Applicants filed a new request with the City for siting approval of a proposed landfill at the same location described in their 2002 request. Waste Management moved to dismiss the new request, arguing that it was barred by subsection 39.2(m) of the Act. See 415 ILCS 5/39.2(m) (West 2004)

5

(prohibiting a "request for local siting approval which is substantially the same as a request which was disapproved *** within the preceding 2 years"). The City Council denied the motion to dismiss, finding that the two requests were not substantially similar and that the 2002 request had not been disapproved within the meaning of subsection 39.2(m) because the local siting authority, the Council, had approved it despite the Board's subsequent reversal.

On the merits, the City Council granted Applicants' 2003 request. Objectors petitioned for review before the Board, raising claims similar to those made against the 2002 request. This time, however, the Board confirmed the Council's decision. As to the denial of Waste Management's motion to dismiss, the Board found that subsection 39.2(m) was inapplicable for the same reason articulated by the City Council: Applicants' 2002 request had not been disapproved within the meaning of the statute because the local siting authority, the Council, approved it. Since this finding was dispositive on the question, the Board did not address whether Applicants' 2003 request was substantially similar to their 2002 request.

Objectors filed the instant appeal (Town & Country II) which, having been decided, now comes before us on a supervisory order from the supreme court. County of Kankakee, Illinois, *et al.* v. Pollution Control Board *et al.*, 231 Ill. 2d 659, 902 N.E.2d 1077 (2009). The supreme court has directed us to vacate our order and reconsider the cause as follows: (1) determine whether Applicants' 2002 request was disapproved for purposes of subsection 39.2(m) of the Act; (2) if we find such disapproval, determine whether the cause must be remanded to the Board for a decision on whether Applicants' 2003 request was substantially similar to their 2002 request; and (3) if we find that remand is not necessary, decide the parties' remaining issues on appeal.

ANALYSIS

6

Disposition of the instant appeal has been delayed by multiple changes in authorship of the court's judgment and Justice Holdridge deserves credit for the bulk of this opinion. Now, in accord with the supreme court's supervisory order, we find that (1) Applicants' 2002 request was disapproved for purposes of subsection 39.2(m) of the Act when the Board reversed the City's Council's decision on the 2002 application on the grounds the Council erred in finding that the proposed landfill met the criterion in subsection 39.2(a)(ii) if the Act; (2) remand is not necessary to determine whether Applicants' 2003 request was substantially similar to their 2002 request because their 2003 request fails to satisfy all of the criteria in section 39.2(a) (415 ILCS 5/39.2(a) (West 2004)); and (3) our finding that the 2003 application fails to satisfy all of the statutory criteria is dispositive because all of the statutory criteria must be met as a precondition for local siting approval.

## 1. Refiling

Subsection 39.2(m) of the Act reads: "An applicant may not file a request for local siting approval which is substantially the same as a request which was disapproved pursuant to a finding against the applicant under any of criteria (i) through (ix) of subsection (a) of this Section within the preceding 2 years." 415 ILCS 5/39.2(m) (West 2004). Objectors argue that this bar applies because (1) Applicants' 2002 request was "disapproved" when the Board reversed the City Council's grant of approval, and (2) the 2003 request was substantially similar to the 2002 request. Regarding the prior-disapproval requirement, Applicants and the Board argue that the 2002 request was not disapproved within the meaning of the statute because the local siting authority, the City Council, approved it. Applicants also argue that the 2003 request was not substantially similar to the 2002 request.

7

This part of the issue involves statutory construction, a question of law and we review the Board's decision de novo. Shields v. Judges' Retirement System, 204 Ill. 2d 488, 492 (2003). Though we are not bound by the Board's interpretation of subsection 39.2(m), we will give it weight in our own construction. Shields, 204 Ill. 2d at 492 ("As a general rule, courts will accord deference to the interpretation of a statute by the agency charged with its administration"); Cojeunaze Nursing Center v. Lumpkin, 260 Ill. App. 3d 1024, 1029 (1994) ("Although not formally bound by administrative decisions interpreting the legal effect of statutory language, a court will give an administrative agency's conclusions great weight in the court's own statutory construction").

A reviewing court's responsibility when construing a statute is to ascertain and give effect to the intent of the legislature. In re Madison H., 215 Ill. 2d 364, 372 (2005). The best evidence of legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning. Paris v. Feder, 179 Ill. 2d 173, 177 (1997). The statute must be evaluated as a whole, with each provision construed in connection with every other section. Abrahamson v. Illinois Department of Professional Regulation, 153 Ill. 2d 76, 91 (1992). "Accordingly, words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute." Southern Illinoisan v. Illinois Department of Public Health, 218 Ill. 2d 390, 415 (2006).

Applicants' 2002 request was disapproved for purposes of subsection 39.2(m) of the Act. Although section 39.2(m) references "disapproval" under subsection (a), and subsection (a) contains no mention of the Board, we are not limited to section 39.2(a) for context in which to determine the meaning of "disapproved" in section 39.2(m). "The statute should be evaluated as

8

a whole; each provision should be construed in connection with every other section." Abrahamson v. Illinois Department of Professional Regulation, 153 Ill. 2d 76, 91, 606 N.E.2d 1111, 1118 (1992). Therefore, pursuant to the rules of statutory construction, the proper context in which subsection 39.2(m) speaks of a prior request that was "disapproved pursuant to a finding against the applicant" (415 ILCS 5/39.2(m) (West 2004)) is Title X of the Act as a whole, not just subsection 39.2(a) of Title X of the Act.

When read in the proper context, a prior request is "disapproved pursuant to a finding against the applicant" following resolution of any statutorily prescribed "contest [of] the appeal of the county board or the governing body of the municipality." 415 ILCS 5/40.1 (West 2004). Resolution of a contest may occur by a written decision by the Board or the passage of "120 days after the date on which [the Board] received the petition" to contest the decision of the county board or governing body. 415 ILCS 5/40.1 (West 2004). Under section 40.1 of the Act, if a petition to contest "approval" by the local siting authority is filed, but the Board fails to take action thereon, it is *only* after the passage of 120 days that "the petitioner may deem the site location approved." 415 ILCS 5/40.1 (West 2004).

The Act signals the legislature's intent to vest approval and disapproval authority at both the local level *and* at the review level. The legislature referred to the "local siting review process" not the "local approval or disapproval process." 415 ILCS 5/39.2(n) (West 2004). This use of language reflects the legislature's intent that the *local* siting approval is just the first step (where admittedly only one step may be necessary) in the process to approve or disapprove a siting application.

The coextensive authority provided to the "local" and "review" siting procedures is also

9

reflected by legislature's failure to distinguish between "approval authority" at the local level and at the review level in section 39.2(m). Section 39.2(m) refers to "a request which was disapproved pursuant to a finding against the applicant under any of criteria (i) through (ix)." 415 ILCS 5/39.2(m) (West 2004). The Board found that the 2002 application failed to meet the criterion in subsection 39.2(a)(ii) and reversed the County's decision. The Board's decision is, on its face, "a finding against the applicant under any of criteria (i) through (ix) of subsection (a)." 415 ILCS 5/39.2(m) (West 2004).

Based on the foregoing, no statutory basis exists to conclude that the time limitation in section 39.2(m) does not apply equally to a finding by the Board "disapproving" an application as to a finding by the local siting authority "approving" an application pursuant to any of the criteria. Accordingly, we hold that Applicants' 2002 request was "disapproved" by the Board for purposes of subsection 39.2(m) of the Act. Although our holding, standing alone, would seem to require an analysis of the effect of the Board's failure to determine whether Applicants' 2003 request was substantially similar to their 2002 request, we do not believe that substantial inquiry into the matter is either necessary to comply with the supreme court's supervisory order or prudent in this case.

We are all in agreement on the remaining issues in this case. Our holding on the issue of whether the proposed facility is consistent with the County's solid waste management plan is dispositive because, regardless of whether applicants are restricted from filing their request by section 39.2(m), their request fails to satisfy all of the statutory criteria, and all of the statutory criteria must be met as a precondition for local siting approval. Stated differently, the Board's failure to consider the substantial similarity issue is of no effect on the ultimate outcome of these

10

proceedings, and, consistent with direction from the supreme court, we will not waste judicial resources on further analysis. In re Alfred H.H., 233 Ill. 2d 345, 351, 910 N.E.2d 74, 78 (2009) ("As a general rule, courts in Illinois do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided").

### 2. Notice

The County argues that Applicants failed to comply with the notice requirement of subsection 39.2(b) of the Act, which reads:

> "No later than 14 days before the date on which the *** governing body of the municipality receives a request for site approval, the applicant shall cause written notice of such request to be served either in person or by registered mail, return receipt requested, on the owners of all property within the subject area not solely owned by the applicant, and on the owners of all property within 250 feet in each direction of the lot line of the subject property, said owners being such persons or entities which appear from the authentic tax records of the County in which such facility is to be located ***." 415 ILCS 5/39.2(b) (West 2004).

This requirement is jurisdictional and must be followed to vest the local siting authority with power to hear a landfill request. Waste Management of Illinois, Inc. v. Pollution Control Board, 356 Ill. App. 3d 229, 234 (2005). Since the pertinent facts are undisputed in the instant case, this issue presents a question of law subject to de novo review. Waste Management, 356 Ill. App. 3d at 231-32.

The land within the statutory notice area included Parcel 13-16-23-400-001, the Bradshaw farm. Sheila Donahoe, the County's chief assessment officer, testified that she

11

searched the County's authentic tax records to determine who owned the Bradshaw farm. Specifically, she reviewed a property record card contained in a computer database shared between the assessor's office and the treasurer's and tax collector's office. The card identified six co-owners of the farm: Gary Bradshaw, James Bradshaw, Jay Bradshaw, Ted Bradshaw, Denise Fogle, and Judith Skates. For all owners except Skates, the address listed in the database was 22802 Prophet Road, Rock Falls, Illinois, 61071. Pursuant to a change-of-address card submitted by Skates, her address was listed as 203 South Locust Street, Onarga, Illinois, 60955-1224. The card was scanned into the County's database on March 7, 2002, meaning Skates must have submitted it sometime before then. The name she used on the card was "Skates, Judith Ann Bradshaw."

The database also included "mailing flags" for the Bradshaw farm. Pursuant to these flags, tax bills and notices were not to be sent to Gary Bradshaw, James Bradshaw, Jay Bradshaw, Ted Bradshaw, and Denise Fogle. Instead, all such mailings were to be sent only to Judith Skates at her Onarga address. In this regard, the following colloquy occurred during Donahoe's testimony:

"Q. Now, how would you know to send tax bills and notices for all of these individuals, to Judith Skates in Onarga rather than to the various Bradshaws in Rock Falls?

A. Because that was their request to send them to her and we indicated that we would send notices relating to the taxes, namely, the tax bill, change notice, delinquent notice, extension notice, et cetera, to her.

\* \* \*

12

Q. Ms. Donahoe, based upon Judith Skates' requests or request, as indicated in the name and address change, which she filed, notices and bills are no longer sent to any of the Bradshaws at the Rock Falls address, is that correct?

A. That's correct.

Q. And if you were to send anything to any of the Bradshaws, it will be sent here, to Judith Skates in Onarga, Illinois?

A. If I were sending anything on this parcel as it relates to these four notices, it would be sent to Judith Skates."

Accordingly, the bill for taxes due on the farm in 2002 was sent exclusively to Skates.

Donahoe testified that the County did not "send any other types of documents to property owners besides documents in those four categories" (tax bill, change notice, delinquent notice, and extension notice), and that the mailing flags did not mention notices under subsection 39.2(b) of the Act. When asked if anyone in her office had informed Applicants "that Judith Skates was the agent for service of process of all of the other owners of that property," Donahoe answered: "In talking with my staff and questioning them about this, the only information they would have that would be on these cards, it would indicate that every owner is listed and every owner has an address."

Mark Frechette, the County's treasurer and <u>ex officio</u> tax collector, submitted an affidavit stating that he reviewed the County's authentic tax records, which showed five owners (Gary Bradshaw, James Bradshaw, Jay Bradshaw, Ted Bradshaw, and Denise Fogle) with a single Rock Falls address and one owner (Judith Skates) with an Onarga address.

Thomas Volini, Town & Country's president, testified that he was familiar with the

13

Bradshaw farm. In a discovery deposition, he stated that Judith Skates was "the taxpayer of record" and "the party to be contacted in respect of the taxes on that property." He also explained that in connection with Applicants' 2002 request (Town & Country I), an attempt had already been made to serve notice at 22802 Prophet Road, Rock Falls, Illinois. In addition to the other five owners, the County's tax records once indicated that Skates could be served at the Rock Falls address as the taxpayer of record. However, in 2002 the process server discovered "that none of the parties listed *** were available at that address." Specifically, the resident at the address advised that "none of those parties resided [there] and that the only competent way of contacting them would be to contact Judith Skates who was acting as their representative." The resident then provided Skates' Onarga address for such contact.

Regarding his efforts to identify property owners in the instant case (Town & Country II), Volini testified that he interviewed the county clerk, the county treasurer, and staff members at the county assessor's office. He also consulted maps, copied property record cards, copied tax bills, and prepared affidavits to assure that his mailings of notice were "up to speed *** with the current records of the county." When asked if he mailed notice to the Rock Falls address, Volini explained:

"In this case, I don't believe I did, because I believe we had more up-to-date information indicating that, A, Judith Skates was the representative of the taxpayers of record, and, B, that she was, indeed, the taxpayer of record, and, C, that her residence address, according to the current records of the county, was in Onarga and not in Rock Falls, and, D, pursuant to an interview with the occupant of the property in Rock Falls, which had previously been indicated to be a location at which Judith Skates or any of the

14

other potential assessees of record might have been contacted was, in fact, an incompetent address because none of them lived there, and, F, because the occupant of that home directed us to Judith Skates as the representative of those family members and directed us to the same address in Onarga, Illinois that the then current records of the county indicated was the place to contact her."

According to the county employees interviewed by Volini, "only the tax bill itself" reflected whom the county deemed "the appropriate party" to its "authentic tax records." The bill provided the most up-to-date information regarding the person or persons to whom notices should be sent.

Based on this information, Volini sent one notice by certified mail, return receipt requested, to Skates at her Onarga address and another notice by certified mail, return receipt requested, to the remaining owners at Skates's Onarga address "C/O Judith Skates." The second mailing listed the other owners individually. Skates signed both return receipts on February 12, 2003. She did not, however, forward the second notice to the other owners (her siblings), each of whom submitted an affidavit stating that he or she did not become aware of the siting proceedings until after the proceedings were concluded.

The County argues that Volini's efforts did not satisfy the notice requirement of subsection 39.2(b) of the Act because "notices were not sent to the last known address for five owners," and "separate notices were never sent to or received by those five property owners at any address."

The plain language of subsection 39.2(b) does not include the phrase "last known address"; it mentions service by registered mail without specifying any mode of determining the mailing address. Moreover, if Volini had sent notice of Applicants' 2003 request to the Rock

15

Falls address, such notice would have been objectionable on due process grounds because he knew from previous efforts that the address was invalid. See, e.g., Robinson v. Hanrahan, 409 U.S. 38, 34 L. Ed. 2d 47, 93 S. Ct. 30 (1972) (where State knew that automobile owner was not residing at address to which forfeiture notice was mailed, and that he could not get there, State's manner of service violated due process). Since we must construe subsection 39.2(b) in a manner that upholds its constitutionality where reasonably possible (see Cook County Republican Party v. Illinois State Board of Elections, 232 Ill. 2d 231, 239 (2009)), we will avoid a construction that offends due process. Applicants were not required to mail notice to Gary Bradshaw, James Bradshaw, Jay Bradshaw, Ted Bradshaw, and Denise Fogle at the Rock Falls address because Applicants knew that (1) said owners did not reside there, and (2) the actual resident had declined to accept service for them.

This observation does not likewise apply to Skates's Onarga address. Although Applicants ostensibly knew that none of the other owners lived there, the element of declination by the actual resident (Skates) is missing, and Applicants had reasonable cause to believe that Skates was a proper recipient of notice for the other owners. Volini testified that during the unsuccessful attempt to serve notice at the Rock Falls address in 2002, the resident said "none of those parties resided [there] and that the only competent way of contacting them would be to contact Judith Skates who was acting as their representative." The resident then provided Skates's Onarga address for such contact. When Volini subsequently reviewed the County's authentic tax records, he discovered that Skates had indeed changed her address of record to 203 South Locust Street in Onarga. Moreover, each of the other owners had designated Skates as the recipient of their mailings from the County regarding taxes and tax-related notices on the farm.

16

The significance of this designation is highlighted by the consequences of tax delinquency. If Skates had failed to pay the tax bill on the farm without notifying the other owners, the property could have been sold at a tax sale, resulting in a transfer of fee title. Since the other owners voluntarily made Skates the sole recipient of mailings with such potential consequences, Applicants could reasonably conclude that Skates was an appropriate recipient of mailings with lesser potential consequences. At worst, the proposed landfill could only affect the value of the Bradshaw farm without forcing a transfer of ownership.

It bears repeating that subsection 39.2(b) merely mentions service by registered mail without specifying any mode of determining the mailing address. Moreover, even when notice is not received, it comports with due process if reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and their opportunity to present objections. People ex rel. Devine v. $30,700.00 United States Currency, 199 Ill. 2d 142, 156 (2002) (noting that "the practicalities and peculiarities of the case" are relevant factors in determining the sufficiency of notice). We conclude that Applicants met this standard and, in the process, complied with subsection 39.2(b).

The parties cite two instructive cases: Waste Management, 356 Ill. App. 3d 229 and Wabash & Lawrence Counties Taxpayers & Water Drinkers Ass'n v. Pollution Control Board, 198 Ill. App. 3d 388 (1990). In Waste Management, the property owners in question were a husband and wife (Robert and Brenda), living at the same address. The applicant served Robert with notice by certified mail, return receipt requested, but only served Brenda by regular mail, in conjunction with several unsuccessful attempts at personal service. The Board concluded that Brenda had not been served with notice as required by subsection 39.2(b). This court affirmed

17

the Board's decision, observing that the statute requires either personal service or service by registered mail (certified mail being a functional equivalent), return receipt requested--neither of which occurred in respect to Brenda.

In Wabash & Lawrence, the applicant's request for siting approval was approved by the local siting authority, but the approval was vacated by the Board for lack of proper notice. The applicant then filed a second request for local siting approval which was again approved at the local level. This time the Board affirmed the approval. On appeal, the Appellate Court, Fifth District, affirmed the Board's decision. The appellant argued that notice had not been given to certain property owners as required by subsection 39.2(b). The court disagreed, stating:

"The [appellant's] first claim of error involves property that was listed on the tax records as owned by the heirs of a certain individual. It is true only one heir received notice, but only that heir was listed by name and address in the tax records to receive the tax statement on behalf of all the heirs. As [the applicant] notified the owner of the property appearing from the authentic tax records, the [Board] properly found the notice complied with section 39.2(b) of the Act even though all of the heirs did not receive personal notice." Wabash & Lawrence, 198 Ill. App. 3d at 390-91.

This Court's decision in Waste Management rested on the fact that the applicant, despite knowing both the name and valid address of a property owner, failed to serve that owner with notice either in person or by registered or certified mail, return receipt requested. The instant facts are different because, inter alia, (1) Applicants did not know the addresses of the property owners in question, and (2) notice was served on those owners by certified mail, return receipt requested, at Skates's address. The instant case is thus closer to Wabash & Lawrence, where the

18

County's authentic tax records identified only one property owner by name and address. Just as the applicant in <u>Wabash & Lawrence</u> was not required to track down other owners despite knowing their existence from authentic tax records, nothing in the plain language of subsection 39.2(b) required Applicants to track down the owners in question. Knowing a person's existence with no name and address is not meaningfully different, for present purposes, than knowing a person's name with an invalid address (especially when that person has designated someone else, with a known valid address, as the recipient of his or her mailings).

Having carefully considered the County's arguments, we conclude that they read unwritten requirements into the Act. The plain language of subsection 39.2(b) does not require separate mailings to co-owners of property, does not specify any mode of determining the address to be used when serving notice by registered mail, and does not require actual receipt of mailed notice. We are convinced that Applicants' efforts complied with subsection 39.2(b). Accordingly, we affirm the Board's decision that proper notice was afforded the co-owners of the Bradshaw farm.

### 3. Fundamental Fairness

Subsection 40.1(a) of the Act requires the Board to consider, <u>inter alia</u>, "the fundamental fairness of the procedures used by the *** governing body of the municipality in reaching its decision." 415 ILCS 5/40.1(a) (West 2004). A nonapplicant who participates in the siting process thus has a statutory right to fundamental fairness in proceedings before the local siting authority. <u>Land & Lakes Co. v. Pollution Control Board</u>, 319 Ill. App. 3d 41, 48 (2000), *rev'd on other grounds*, <u>Peoria Disposal Co. v. Illinois Pollution Control Board</u>, 385 Ill. App. 3d 781, 796-97 (2008). However, fundamental fairness in this context incorporates only the minimal

19

standards of procedural due process, such as the right to be heard, the right to cross-examine adverse witnesses, and the right to have impartial rulings on the evidence. Peoria Disposal Co., 385 Ill. App. 3d at 797. The members of a local siting authority are considered to have acted without bias (E & E Hauling, Inc. v. Pollution Control Board, 107 Ill. 2d 33, 42 (1985)), and the fact that a member of the authority has taken a public position or expressed strong views on the issue does not overcome this presumption (Concerned Adjoining Owners v. Pollution Control Board, 288 Ill. App. 3d 565, 573 (1997)). To establish bias, the complaining party must show that a disinterested observer might conclude that the local siting authority adjudged both the facts and law before hearing the case. Concerned Adjoining Owners, 288 Ill. App. 3d at 573.

In the instant case, the Board found that the City Council's siting proceedings were fundamentally fair. We will not reverse this finding unless it is clearly erroneous. Peoria Disposal Co., 385 Ill. App. 3d at 797 (noting that reversal is not warranted unless, after examining the entire record, the reviewing court is left with a definite and firm conviction that a mistake has occurred).

The County argues that the Board committed reversible error for several reasons. First, the County claims that the City Council's proceedings were fundamentally unfair because the Council prejudged the merits of Applicants' request for siting approval. As evidence for this claim, the County cites lawsuits filed by the City in November of 2002 and June of 2003.

The 2002 suit concerned the County's expenditure of funds generated through fees, taxes, or surcharges on solid waste disposal. According to the complaint, the County had violated the Act by using such funds to:

> "(a) Reimburse the general fund of Kankakee County for expenditures involved in

20

the litigation against the City of Kankakee in the amount currently in excess of One Hundred Twenty Thousand and No/100 Dollars ($120,000.00);

(b) Reimburse the general fund of Kankakee County for expenditures made to pay for salaries of the Planning Department of the County of Kankakee and for which no allocation of time has justified the reimbursement of said expenditures;

(c) Pay for solid waste planning for which no planning has occurred;

(d) Loan said funds to the defendant's general fund without repayment of said funds from the general fund and without the generation of interest as a result of said loan; and

(e) In other ways has misused and misappropriated the funds obtained as a result of said fees."

The City sought an injunction prohibiting the County from making such expenditures of the funds in question. As a consequence of the unauthorized expenditures, the City's request "to use said funds for purposes of recycling and other projects related to solid waste disposal" had allegedly "been limited in amount or denied totally."

The 2003 lawsuit focused on certain amendments to the County's solid waste management plan. According to the complaint, the amended plan (1) interfered with the City's home-rule power by "attempt[ing] to eliminate the siting of a solid waste facility within the boundaries of the City of Kankakee," and (2) constituted unenforceable special legislation by "confer[ring] a special benefit of privilege on Waste Management of Illinois, Inc., to the exclusion of all others." The latest amendment to the plan, written to clarify the meaning of prior amendments, declared:

21

"It is the intent of Kankakee County that no landfills or landfill operations be sited, located, developed or operated within Kankakee County other than the existing landfill located southeast of the intersection of U.S. Route 45/52 and 6000 South Road in Otto Township, Kankakee County, Illinois. The only exception to this restriction on landfilling is that an expansion of the existing landfill on the real property that is contiguous to the existing landfill would be allowed under this Plan."

Waste Management operated the existing landfill at the location specified. The City sought an order (1) enjoining the County "from attempting to interfere with the siting by the City," and (2) declaring the amended plan void and unenforceable as special legislation.

We disagree with the County's claim that these actions demonstrate fundamental unfairness in the siting proceedings, which occurred thereafter. As noted above, it is presumed that members of the City Council acted without bias. This presumption is not overcome by evidence merely showing that the City took a public position; the dispositive inquiry turns on what a disinterested observer might conclude about members of the City Council. In our view, such a person would not conclude that Council members had prejudged Applicants' siting request. Rather, to a disinterested observer, the 2002 lawsuit would signal concern about the availability of recycling and solid-waste disposal funds, and the 2003 suit would signal concern about safeguarding the City's home-rule power. These concerns involve matters separate from Applicants' siting request, even though they arose in connection with controversies about the request. Accordingly, we find no reversible error.

The County makes additional arguments on the fundamental-fairness issue. At this point, however, we interject the following issue because it also involves the County's amended solid

22

waste management plan.

### 4. Subsection 39.2(a)(viii) Criterion

If a proposed pollution control facility "is to be located in a county where the county board has adopted a solid waste management plan consistent with the planning requirements of the Local Solid Waste Disposal Act or the Solid Waste Planning and Recycling Act," local siting approval shall not be granted unless "the facility is consistent with that plan." 415 ILCS 5/39.2(a)(viii) (West 2004).

The County adopted a solid waste management plan in 1993 and amended the plan in 1995, 2001, 2002, and 2003. The resolution containing the 2001 amendment stated that: Waste Management's existing landfill had served the County and its residents well for 27 years; expansion of that landfill would have "positive impacts," whereas "a second landfill would have negative impacts" on nearby residents; and it was in the best interests of county residents "that one landfill be maintained in its current location." The actual language of the amendment declared:

> "An expansion of the [Waste Management] landfill, if approved, will satisfy the County's waste disposal needs for an additional 20 years. No new disposal facilities will be necessary, or desired, in Kankakee County for purposes of implementing the Plan. Kankakee County will not support and will contest the development of any other landfill in the County, unless the expansion of the existing landfill is not approved."

This resolution was adopted in October of 2001.

In February of 2002, Applicants announced their intention to request local siting approval

23

for a new landfill to be located within the boundaries of the City.[1]  Approximately one month later, the County adopted the resolution containing the 2002 amendment to its solid waste management plan.  In the resolution, the County announced its desire "to clarify the intent and purpose" of the 2001 amendment.  The new amendment explicitly stated that if approval were granted for expansion of Waste Management's existing landfill, "no new facilities would be necessary."  The actual language of the amendment did not elaborate using terms of geographical proximity, although the preamble language declared that "a second, non-contiguous landfill would have impacts upon County residents located near any such proposed new facility." (Emphasis added.)

In August of 2002, the City Council granted siting approval in Town & Country I, and in January of 2003, the Board reversed the Council's decision.  Approximately one month later, the County adopted the resolution containing the 2003 amendment to its solid waste management plan.  The resolution stated:

> "WHEREAS, the County presently wishes to clarify the intent and purpose of [the 2001 and 2002] amendments to the Solid Waste Management Plan, as well as make further amendments and updates to its Solid Waste Management Plan; and
>
> * * *
>
> WHEREAS, the present landfill and its owner [Waste Management] have provided reliable and convenient disposal capacity for the past twenty-seven (27) years, and that existing landfill's capacity will be exhausted at present disposal rates within three (3) years; and,

---

[1]This request gave rise to Town & Country I.

WHEREAS, the County hereby seeks to avoid a second non-contiguous landfill being developed;

WHEREAS, the County wishes to limit the impacts of landfilling within the County, while at the same time providing the benefit of additional landfill capacity within the County, the County hereby amends its Solid Waste Management Plan such that no other landfills should be developed in the County with the limited exception that the existing landfill may be expanded.

WHEREAS, the expansion of the existing landfill would have positive impacts on the County, including, but not limited to enhancement of the current tipping fee and provision for a host fee, as well as the continued availability of reliable, convenient, cost-effective disposal capacity, all to the benefit of the County and its residents; and

WHEREAS, the County Board has reviewed the decision of the Illinois Pollution Control Board in [Town & Country I] dated January 9, 2003 and the County Board seeks to dispel any question or ambiguity, and further affirm that it is its intention to limit the landfilling within the County only to the existing landfill, and any expansion of that landfill in an area contiguous to the existing landfill, as well as also affirm that no other landfills are planned for or desired within the County, and the siting or development of any other non-contiguous landfill within the County is inconsistent with this plan.

NOW, THEREFORE, BE IT RESOLVED that:

The first two paragraphs of Chapter Five, Section VI: Available Landfill Capacity In Kankakee County of the Kankakee County Solid Waste Management Plan, on page 339, are hereby deleted and replaced with the following:

25

It is the intent of Kankakee County that no landfills or landfill operations be sited, located, developed or operated within Kankakee County other than the existing landfill located southeast of the intersection of U.S. Route 45/52 and 6000 South Road in Otto Township, Kankakee County, Illinois. The only exception to this restriction on landfilling is that an expansion of the existing landfill on the real property that is contiguous to the existing landfill would be allowed under this Plan. The expansion or development of a landfill on the real property contiguous to the existing landfill would limit the impacts of landfilling activity in the County. Accordingly, the development of any other landfills in the County on land that is not contiguous to the existing landfill is inconsistent with this County's Solid Waste Management Plan. A noncontiguous landfill is inconsistent with this Plan regardless of whether it is, or to be, situated upon, unincorporated County land, incorporated municipal land, village land, township land, or any other land, within the County borders that is not contiguous and adjacent to the existing landfill."

This resolution was adopted 24 days before the filing of Applicants' 2003 request for local siting approval.

During the siting proceedings, Michael Donahue, a land planning and zoning consultant, testified that he was retained by Town & Country to perform a land use compatibility analysis. He opined that Applicants' proposed landfill was compatible with the surrounding area. As to the contiguity requirement in the County's solid waste management plan, he expressed his understanding that the word "contiguous" had "more than one definition," and that the proposed

26

landfill was "in very near proximity" to Waste Management's existing landfill, which he "underst[ood] to be one of the definitions of the word contiguous." Another definition he understood was "adjacency," which meant "abutting." When asked if the proposed landfill abutted Waste Management's existing landfill, he said, "They don't physically abut one another, no."

Devin Moose, the head of Envirogen's office in St. Charles, Illinois, testified for Town & Country on the question of whether the proposed landfill was consistent with the County's solid waste management plan. He said the amendments to the plan created ambiguity, leaving room for interpretation. In his view, after consulting several dictionaries, the word "contiguous" could mean either "touching" or "in close proximity without touching." He thus opined that the proposed landfill was contiguous to the existing Waste Management landfill because it was in "close proximity" to that landfill. The two sites were located "probably about a mile and three quarters" from each other.

In its written decision, the City Council found that because of certain procedural defects (failure to provide notice and public hearings), the County had not adopted a solid waste management plan consistent with the Local Solid Waste Disposal Act or the Solid Waste Planning and Recycling Act. Nonetheless, as if the plan were valid, the Council proceeded to address the consistency requirement of subsection 39.2(a)(viii) and declared: "[Applicants' request] is consistent with the Kankakee County Plan as adopted due to the patent and latent ambiguity of the plan and the failure to define and describe terms of the plan including 'contiguous' and 'existing.' Because the current site is located so as to be near, and in an area which is contiguous, the site is consistent with the plan." Also, the Council expressed its opinion

27

that the plan violated the City's "statutory authority to site a solid waste disposal facility and \*\*\* constitutional authority as a Home Rule Unit of government," though the Council acknowledged that it lacked authority "to make such a finding within the confines of this hearing."

On appeal, the Board declared that the City Council lacked jurisdiction to determine the validity of the County's solid waste management plan, and that "allegations concerning the adoption of the County's [plan] are not proper for the Board's consideration in a Section 40.1 pollution control facility siting appeal." Accordingly, the Board refused to consider "whether the City erroneously concluded the County's [plan] was invalid." The Board did, however, consider and reject a procedural challenge to the 2001, 2002, and 2003 amendments to the plan. On the question of consistency between Applicants' proposed facility and the plan, the Board explained its decision as follows:

"The Board finds that the record contains evidence in support of the City's finding that the proposed application is contiguous to the existing Waste Management facility. The February 11, 2003 County Plan amendment states 'the development of any other landfills in the County on land that is not contiguous to the existing landfill is inconsistent with this County's Solid Waste Management Plan.' The Board finds that under the possible definition presented by Mr. Moose at the City hearings, a landfill development within two miles could be 'in close proximity without touching' the Waste Management facility. The February 11, 2003 amendment does not require any expansion or development of a landfill to touch or border the real property of the existing landfill. Therefore, the Board finds the City's conclusion that [Applicants'] proposal is contiguous to the existing landfill is not against the manifest weight of the evidence."

28

For these and other reasons, the Board affirmed the City Council's finding that Applicants' proposed facility met the criterion in subsection 39.2(a)(viii) of the Act.

In its brief before this Court, and consistent with its written decision, the Board makes no argument that the County's solid waste management plan is invalid. Accordingly, the County and Board agree that Applicants' proposed landfill must be contiguous to Waste Management's existing landfill but disagree on whether that requirement is met. The essential facts are not in dispute; the only question involves their legal effect under the language of the solid waste management plan. Accordingly, our review is de novo. Cojeunaze Nursing Center, 260 Ill. App. 3d at 1029. This standard does not prevent us from deferring to an administrative agency's experience and expertise (see Rockwood Holding Co. v. Department of Revenue, 312 Ill. App. 3d 1120, 1123 (2000)), but the agency's interpretation is not binding and "will be rejected when it is erroneous" (Shields, 204 Ill. 2d at 492)).

The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature (here, the County Board). Wade v. City of North Chicago Police Pension Board, 226 Ill. 2d 485, 509-10 (2007). The best indicator of legislative intent is the language of the statute itself, which must be given its plain and ordinary meaning. Cinkus v. Village of Stickney Municipal Officers Electoral Board, 228 Ill. 2d 200, 216 (2008). When the statutory language is clear, other tools of construction are not necessary. Cinkus, 228 Ill. 2d at 216.

"Where the meaning of a statute is unclear from a reading of its language, courts may look beyond the language of the statute and consider the purpose of the law, the evils it was intended to remedy, and the legislative history behind it." Stroger v. Regional Transportation Authority, 201 Ill. 2d 508, 524 (2002); see Midkiff v. Gingrich, 355 Ill. App. 3d 857, 862 (2005)

29

(noting that statutory language is ambiguous when it is subject to more than one reasonable interpretation). Although a policy section, such as a preamble, cannot be used to create an ambiguity in a statute or ordinance, it may be used to clarify ambiguous portions of an act. Triple A Services, Inc. v. Rice, 131 Ill. 2d 217, 227 (1989). Indeed, when statutory language is ambiguous, its preamble ranks among the quintessential sources of legislative intent. Atkins v. Deere & Co., 177 Ill. 2d 222, 232 (1997).

In the instant case, the disputed statutory language appears in the paragraph added to the County's solid waste management plan via the 2003 amendment. By the terms of that paragraph, as an essential element of consistency with the plan, any landfill expansion or development must be located "on the real property contiguous to the existing landfill" operated by Waste Management at the specified address. Such use of the word "contiguous" occurs four times throughout the paragraph. The fourth usage precludes any landfill "that is not contiguous and adjacent to the existing landfill." Thus, the word "adjacent" must also be construed.

Town & Country's witnesses, Michael Donahue and Devin Moose, correctly testified that the word "contiguous" can have different meanings. Standard definitions are: "1. Sharing an edge or boundary; touching. 2. Nearby; neighboring; adjacent." The American Heritage Dictionary of the English Language 288 (1969). The word can signify either actual contact or mere close proximity, and no clarity is gained by referring to "adjacent," which can mean either "adjoining" (defined as, inter alia, "contiguous") or merely "[c]lose to; *** lying near." The American Heritage Dictionary of the English Language 16 (1969).

These possibilities render the language of the County's solid waste management plan ambiguous, as stated by Devin Moose and found by the City Council. See, e.g., People v.

30

Robinson, 217 Ill. 2d 43, 56 (2005) (where dictionary entry supported two meanings of the statutory phrase "pursuant to," one favoring each party's interpretation, ambiguity existed warranting consideration of other evidence to ascertain legislative intent); Midkiff, 355 Ill. App. 3d at 861-62 (2005) (same for the word "amount"). In addition to the City Council, the Board recognized ambiguity when it cited "the possible definition presented by Mr. Moose" to support its finding of contiguity. Immediately after doing so, the Board concluded that "[t]he February 11, 2003 amendment does not require any expansion or development of a landfill to touch or border the real property of the existing landfill." This interpretation is erroneous.

As noted above, the cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislative body. This rule applies throughout the process of statutory construction. An ambiguity in statutory language does not create interpretive license to simply choose one or the other of possible meanings; rather, it simply widens the range of evidence that may be used to discover what the drafters intended. As our supreme court has explained: "If the language of a statute is susceptible to two constructions, one of which will carry out its purpose and another which will defeat it, the statute will receive the former construction." Harvel v. City of Johnston City, 146 Ill. 2d 277, 284 (1992). If the Board had properly applied these principles, it would have reached a different conclusion about the meaning of the 2003 amendment to the County's solid waste management plan.

In its resolution containing the 2001 amendment, the County explained that Waste Management's existing landfill had served county residents well and that a second landfill would negatively impact nearby residents. Accordingly, the County declared that the interests of all residents would be best served by "one landfill *** maintained in its current location." When

31

Applicants proposed a new landfill to be located 1¾ miles away from Waste Management's existing facility, the County responded with its 2002 amendment "to clarify the intent and purpose" of the 2001 amendment. The resolution containing the 2002 amendment indicated that the County was acting in response to the prospect of "a second, non-contiguous landfill."

Likewise, the resolution containing the 2003 amendment, passed for additional clarification of legislative intent, expressed the County's desire "to avoid a second non-contiguous landfill being developed." The amendment meant "that no other landfills should be developed in the County with the limited exception that the existing landfill may be expanded." Accordingly, the County declared its

> "intention to limit the landfilling within the County only to the existing landfill, and any expansion of that landfill in an area contiguous to the existing landfill, as well as also affirm that no other landfills are planned for or desired within the County, and the siting or development of any other non-contiguous landfill within the County is inconsistent with this plan."

These facts show that Applicants' proposed landfill was the immediate object of the County's decision to preclude "non-contiguous" landfilling. As such, the County intended its use of the word "contiguous" to prevent what Applicants were proposing--a new landfill located 1¾ miles away from Waste Management's existing landfill. This intent corresponds only to the first definition listed above ("Sharing an edge or boundary; touching"), not the second ("Nearby; neighboring; adjacent"). Accordingly, the Board erred in finding that the proposed landfill was contiguous to the existing landfill for purposes of the County's solid waste management plan.

As we have observed, the cardinal rule of statutory construction applies throughout the

interpretive process. When a statute is rendered ambiguous by two possible definitions of a single term, a construing tribunal is not at liberty to simply choose one of those definitions. The decision must be controlled by ascertainment of legislative intent. The County clearly did not intend its 2003 amendment to allow for Applicants' proposed landfill, and the word "contiguous" must be construed in light of this fact.

Applicants, in addition to adopting the Board's statutory-construction argument in toto, argue that "the Kankakee County Solid Waste Management Plan as adopted and amended violates the Environmental Protection Act and the Illinois Constitution as an improper infringement and limitation upon the home rule powers of an independent local government jurisdiction." Although the Board refused to consider these arguments below (on jurisdictional grounds), Applicants urge us to adopt them as bases for reversal. In support of their position, Applicants cite the general proposition that we may affirm a decision for any reason warranted by the record, regardless of the particular reasons given by the lower tribunal. While this proposition is generally true, it has no application to claims that could not have been properly adjudicated by the lower tribunal in the first place, or to claims that cannot be properly raised on appeal. Such is the case here.

In Residents Against a Polluted Environment v. Pollution Control Board, 293 Ill. App. 3d 219 (1997), the Board refused to hear evidence that a landfill siting applicant had influenced the process of amending a county solid waste management plan. On appeal, this court stated:

"We agree that section 40.1 does not authorize the Board to review the process involved in the county's amendment of its Plan. The appellants do not cite, nor do we find, any statutory or judicial authority which would allow evidence to be presented

33

concerning the county's amendment of its Plan.  Indeed the express language of the Act indicates that the purpose of the siting process is to determine whether the proposed facility *complies* with the county's Plan.  415 ILCS 5/39.2(a)(viii) (West 1994).  The Act does not authorize an inquiry into the county's prior *amendment* of the Plan.  Rather, the adoption and amendment of a solid waste management plan are governed by the Local Solid Waste Disposal Act (415 ILCS 10/1 *et seq.* (West 1994)) and the Solid Waste Planning and Recycling Act (415 ILCS 15/1 *et seq.* (West 1994)).  Neither of these acts authorizes the Board in a siting approval appeal to review the procedures used by a county in adopting its solid waste management plan."  Residents Against a Polluted Environment, 293 Ill. App. 3d at 223.

Appellants acknowledge this passage but dismiss it on the grounds that Residents Against a Polluted Environment is factually distinguishable from the instant case.  However, any factual distinction is immaterial for present purposes because the passage contains an applicable statement of law.  In these administrative proceedings, there is no statutory authority to adjudicate claims about the legitimacy of plan adoption or amendment.  We cannot expand our review beyond the scope of our statutory authorization.  C.f. Town & Country Utilities, Inc. v. Pollution Control Board, 225 Ill. 2d 103, 122 (2007) (noting that "[t]he jurisdiction of the court in this administrative review action *** is limited by the statutes conferring special statutory jurisdiction").

As for Applicants' home-rule argument, it cannot be properly raised for the additional reason that they lack standing.  See, e.g., People v. Campa, 217 Ill. 2d 243, 268 (2005) (noting that a person who wishes to attack legislation as unconstitutional must be a member of the class

34

to whom the legislation is allegedly unconstitutional); <u>In re Marriage of Nienhouse</u>, 355 Ill. App. 3d 146, 153 (2004) ("a party has standing to bring a constitutional challenge only if the party is able to show himself to be within the class aggrieved by the alleged unconstitutionality"). Applicants have no constitutional home-rule rights, and the City, the party whose rights are at issue, has not filed a brief raising this claim.[2]

In light of the foregoing observations, we conclude that the Board committed reversible error when it found that Applicants' proposed facility met the criterion in subsection 39.2(a)(viii) of the Act (consistency with the County's solid waste management plan). This finding is dispositive because all of the statutory criteria must be met as a precondition for local siting approval. Accordingly, there is no reason to address the remaining issues raised in the briefs.

CONCLUSION

For the foregoing reasons, we reverse the decision of the Board, which confirmed the City Council's decision granting Applicants' request for local siting approval.

Reversed.

SCHMIDT, J., concurs.

JUSTICE HOLDRIDGE, dissenting in part and concurring in part:

I dissent from the majority's conclusion that Applicants' 2002 request was disapproved for purposes of subsection 39.2(m) of the Act, which reads: "An applicant may not file a request for local siting approval which is substantially the same as <u>a request which was disapproved pursuant to a finding against the applicant under any of criteria (i) through (ix) of subsection (a)</u>

_____

[2]Applicants also make a passing reference to special legislation. Thus cursory claim yields the same conclusion because it is used in defense of the City's alleged rights.

of this Section within the preceding 2 years." (Emphasis added.) 415 ILCS 5/39.2(m) (West 2004). Objectors argue that the 2002 request was "disapproved" when the Board reversed the City Council's grant of approval. Applicants and the Board, on the other hand, argue that the 2002 request was not disapproved within the meaning of the statute because the local siting authority, the City Council, approved it.

The mandate for local siting review appears in subsection 39(c), which prohibits the Environmental Protection Agency from granting a permit for a new pollution control facility "unless the applicant submits proof *** that the location of the facility has been approved by the *** governing body of the municipality *** in which the facility is to be located in accordance with Section 39.2 of this Act." (Emphasis added.) 415 ILCS 5/39(c) (West 2004). This language indicates that local siting approval is the province of the local siting authority; there is no mention of the Board. Section 39.2 indicates likewise, stating that "the governing body of the municipality, as determined by paragraph (c) of Section 39 of this Act, shall approve or disapprove the request for local siting approval for each pollution control facility which is subject to such review." (Emphasis added.) 415 ILCS 5/39.2(a) (West 2004) (listing nine criteria that govern the decision). This provision reflects the context in which subsection 39.2(m) speaks of a prior request "disapproved pursuant to a finding against the applicant under any of criteria (i) through (ix) of subsection (a)." 415 ILCS 5/39.2(m) (West 2004). As before, there is no mention of the Board; findings on the nine criteria are made by the local siting authority.

The absence of any reference to the Board in this process is revealing, since other parts of section 39.2 show that the legislature was aware of the Board and mentioned its role when relevant. For instance, subsection 39.2(d) states that "[t]he public hearing [conducted by the

36

local siting authority] shall develop a record sufficient to form the basis of appeal of the decision" (415 ILCS 5/39.2(d) (West 2004)), and subsection 39.2(n) states that "[i]n any review proceeding of a decision of the *** governing body of a municipality made pursuant to the local siting review process, the petitioner in the review proceeding shall pay to the *** municipality the cost of preparing and certifying the record of proceedings" (415 ILCS 5/39.2(n) (West 2004)). These provisions clearly reflect a distinction between proceedings in which the decision (approval or disapproval) is made and proceedings in which the decision is reviewed on appeal. See also 415 ILCS 5/39.2(g) (West 2004) (mentioning "siting approval procedures" and "appeal procedures" separately). The Board plays no part in the former--only the latter.

This fact is apparent from section 40.1 of the Act (titled, "Appeal of siting approval"), which reads:

"(a) If the *** governing body of the municipality, as determined by paragraph (c) of Section 39 of this Act, refuses to grant or grants with conditions approval under Section 39.2 of this Act, the applicant may, within 35 days after the date on which the local siting authority disapproved or conditionally approved siting, petition for a hearing before the Board to contest the decision of the *** governing body of the municipality. ***

(b) If the *** governing body of the municipality as determined by paragraph (c) of Section 39 of this Act, grants approval under Section 39.2 of this Act, a third party other than the applicant who participated in the public hearing conducted by the *** governing body of the municipality may, within 35 days after the date on which the local siting authority granted siting approval, petition the Board for a hearing to contest the

37

approval of the \*\*\* governing body of the municipality." (Emphasis added.) 415 ILCS 5/40.1(a), (b) (West 2004).

By this plain language, and the other provisions cited above, the decision of whether to approve or disapprove a local siting request is made by the local siting authority. The Board does not become involved until afterward. Parties can only petition the Board to contest an existing decision of the local siting authority, not to have the Board make its own decision as to approval or disapproval. This explains why "no new or additional evidence \*\*\* shall be heard by the Board," and why the Board must base its hearing "exclusively on the record before the \*\*\* governing body of the municipality." 415 ILCS 5/40.1(a), (b) (West 2004).

The legislature repeatedly used the words "approve" and "disapprove" (and their derivatives) when discussing the role of the local siting authority. On the other hand, the legislature never used such words when discussing the role of the Board.

The County argues otherwise, citing a partial sentence from subsection 40.1(a) of the Act, which reads: "If there is no final action by the Board [on a petition to contest a disapproval or conditional approval] within 120 days after the date on which it received the petition, the petitioner may deem the site location approved \*\*\*." 415 ILCS 5/40.1(a) (West 2004). The County interprets this provision as if the words "by the Board" appeared after the word "approved." This interpretation is problematic because it adds language ("by the Board") that the legislature did not place in the statute.

We "must construe the statute as written and may not, under the guise of construction, supply omissions, remedy defects, annex new provisions, add exceptions, limitations, or conditions, or otherwise change the law so as to depart from the plain meaning of the language

38

employed in the statute." In re County Treasurer and Ex-Officio Collector of Cook County, 323 Ill. App. 3d 1044, 1049 (2001). Since the legislature used the word "approved" in subsection 40.1(a) without explanation, I construe the word in context with its usage elsewhere in the Act. By such construction, the disputed passage means that when an applicant's statutory right to a timely decision on appeal is denied, the applicant may proceed as if local siting approval had been granted and no appeal were necessary in the first place. Rather than signaling approval authority at the appeal level, the passage simply provides a remedy for untimeliness by the Board.

For these reasons, I disagree with the majority's conclusion that Applicants' 2002 request was disapproved for purposes of subsection 39.2(m) of the Act (415 ILCS 5/39.2(m) (West 2004)). Under my analysis, therefore, there would be no reason to address whether the 2002 and 2003 requests were substantially similar. Under the majority's analysis, however, the substantial-similarity question should be addressed per the Supreme Court's supervisory order. The Supreme Court specifically stated that if this court found a prior disapproval of the 2002 request, we "should next consider the effect of the Board's failure to consider the substantial similarity issue." The majority has not done so. Instead, the majority has proceeded to subsequent issues in the case: notice, fundamental fairness, and consistency with the county solid waste management plan. While I agree with, and thus concur in, the majority's conclusions on those issues, I believe it was required to address the substantial-similarity issue before reaching them.