2018 IL App (3d) 160463
No. 3-16-0496 (Consolidated)
Opinion filed July 5, 2018
Modified Upon Denial of Rehearing November 27, 2018

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2018

| | | |
|---|---|---|
| WILL COUNTY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE VILLAGE OF ROCKDALE; THE | ) | Petition for review of |
| BOARD OF TRUSTEES OF THE VILLAGE | ) | Order of the Illinois Pollution |
| OF ROCKDALE; ENVIRONMENTAL | ) | Control Board |
| RECYCLING AND DISPOSAL SERVICES, | ) | |
| INC.; and THE ILLINOIS POLLUTION | ) | |
| CONTROL BOARD, | ) | |
| | ) | Appeal Nos. 3-16-0463 and 3-16-0496 |
| Respondents. | ) | PCB Nos. 16-54 and 16-56 |
| _____ | ) | |
| | ) | |
| WASTE MANAGEMENT OF ILLINOIS, | ) | |
| INC., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE VILLAGE OF ROCKDALE; THE | ) | |
| BOARD OF TRUSTEES OF THE VILLAGE | ) | |
| OF ROCKDALE; ENVIRONMENTAL | ) | |
| RECYCLING AND DISPOSAL SERVICES, | ) | |
| INC.; and THE ILLINOIS POLLUTION | ) | |
| CONTROL BOARD, | ) | |
| | ) | |
| Respondents. | ) | |

JUSTICE McDADE delivered the judgment of the court, with opinion.
Justice Schmidt concurred in the judgment and opinion.
Justice Wright dissented, with opinion.

**OPINION**

¶ 1      Respondent Environmental Recycling and Disposal Services, Inc. (ERDS), filed a siting application seeking approval for a pollution control transfer station. A hearing on the application was held, and the hearing officer found that ERDS failed to meet certain statutory criteria. Subsequently, the Board of Trustees of the Village of Rockdale (Village Board) conditionally approved the application. Petitioners Will County and Waste Management of Illinois, Inc. (WMI), filed separate petitions requesting the Illinois Pollution Control Board (Pollution Board) to review the Village Board's decision. The petitioners argued that (1) the Village Board lacked jurisdiction and (2) certain statutory criteria under section 39.2(a) were not met. The Pollution Board found that (1) the Village Board had jurisdiction to review the siting application, (2) the amendment to the application was proper, and (3) the Village Board's decision on criteria (i), (ii), (v), and (viii) was not against the manifest weight of the evidence. Petitioners appealed. We affirm.

¶ 2                             FACTS

¶ 3      Respondent ERDS operated a refuse hauling business on Moen Avenue in Rockdale, Illinois, which had been in operation for 15 years. It filed a request for siting approval to have a pollution control transfer station in the same area. ERDS sent a notice of a public hearing to nearby landowners, public officials, and entities, including the General Assembly. It also published the notice in the *Herald-News*. The notice stated that ERDS had sought approval to site a transfer station on Moen Avenue. Specifically, the notice reads:

2

"NOTICE OF INTENT TO FILE A REQUEST FOR LOCAL SITING APPROVAL OF A NEW POLLUTION CONTROL FACILITY WITH THE VILLAGE OF ROCKDALE, ILLINOIS

YOU ARE HEREBY NOTIFIED THAT, pursuant to § 39.2(b) of the Illinois Environmental Protection Act ('the Act') 415 ILCS 5/39.2(b), the Applicant, Environmental Recycling and Disposal Services Inc., will file its Request for Siting Approval for a new pollution control facility, the Moen Transfer Station, with the Village of Rockdale, Illinois, 79 Moen Ave., Rockdale, Illinois, 60436, on Dec. 12, 2014. In its request for siting approval, the Applicant will seek approval to site, permit, construct, develop and operate a transfer station as defined by Section 3.500 of the Illinois Environmental Protection Act (the 'Act') (415 ILCS 5/3.500), the Moen Transfer Station located generally north of the intersection of Moen Ave. and Gould Court, at 2277 Moen Ave., said location being in the Village of Rockdale, Illinois.

The proposed facility encompasses approximately 2.16 acres, and is legally described as follows:

Parcel 1: [legal description of the property]

Parcel 2: [legal description of the property]

Property address: 2277 Moen Avenue, Joliet, IL 60436

The proposed facility would be a non-hazardous transfer station which will accept non-hazardous waste for temporary storage, consolidation, and further transfer to a waste disposal/treatment facility. The Applicant will develop and operate the transfer station only as approved by the Illinois Environmental Protection Agency, other applicable regulatory agencies, and as authorized by applicable statutes and regulations. The waste accepted for transfer will be general municipal waste, landscape waste, recyclables and construction and demolition debris generated by residential, commercial and industrial sources. The facility proposes to handle an average 200 tons per day of solid waste. The facility will not accept liquid or hazardous waste. The facility is projected to have an operating life of at least 20 years.

The Applicant is Environmental Recycling and Disposal Services Inc., whose addresses are PO Box 675, Orland Park, Il. 60462, and 2277 Moen Ave., Rockdale, Il. 60436.

On Dec. 12, 2014, the Applicant will file with the Village of Rockdale, Illinois, its Request for Siting Approval. The request will include the substance of the Applicant's proposal and supporting documents.

The Request filed by the Applicants with the Rockdale Village Clerk will be available for your inspection in the Rockdale Village Clerk's Office located at 79 Moen Ave., Rockdale, Illinois,

60438, during normal business hours daily, not including weekends or holidays. Copies of the request or any part thereof will be available from the Rockdale Village Clerk upon payment of the actual cost of reproduction, as outlined in the Illinois Freedom of Information Act (5 ILCS 140/1 *et seq.*)."

¶ 4 In October 2014, ERDS and Will County entered into a host agreement. In December, ERDS filed the siting application. In the application, ERDS stated that the service area for the transfer station includes the northern and western portions of Will County and other adjoining communities. ERDS estimated its service area based on the service area for Prairie View Recycling and Disposal Facility (Prairie View RDF) because it is the primary disposal option for Will County residents and businesses. Relying on the generation and disposal volumes for Will, Kendall, and Grundy Counties, the total population growth in the service area is expected to increase by 62% by 2040.

¶ 5 There are three landfills in the service area: Laraway Recycling and Disposal Facility (Laraway RDF), Environtech Landfill, and Prairie View RDF. The Laraway RDF did not accept municipal solid waste, and Environtech Landfill had about one year of life remaining in its operations. Will County's solid waste management plan (SWMP) and the Prairie View RDF host agreement state that "as much waste as practical" in the service area should be disposed at Prairie View RDF. In one day, Prairie View RDF received 188 loads of disposable waste, 111 of which were loads from transfer trailers. The amount of waste disposed at Prairie View RDF remained consistent from 2007 to 2011 but decreased by 30% from 2011 to 2013.

¶ 6 There are three transfer stations located in the service area: Rockdale Transfer Station, Citiwaste Transfer Station, and Joliet Transfer Station. The Rockdale Transfer Station is located

5

0.3 miles from the proposed facility and takes only recyclables at around 200 tons per day (TPD). Citiwaste Transfer Station is 4.5 miles east of the proposed facility; receives only clean construction and demolition debris, landscape waste, and recyclables; and takes around 100 TPD. Joliet Transfer Station is 1.25 miles from the proposed facility. The station was accepting between 1000 to 1300 TPD in the past but was currently accepting between 2400 to 3700 TPD. Joliet Transfer Station is the only municipal solid waste transfer station in the service area. An overflow of waste on the tipping floor at the beginning of the operation day had been observed at the station. Also, the station had been observed cutting off trucks waiting in line at the end of the day, and consequently, those trucks are not allowed to dump. There was a capacity shortfall of between 853 to 2046 TPD in the service area because the Joliet station was currently generating more than double the amount of its average volume. The shortfall was based on the difference between the Joliet station's current waste acceptance and its waste acceptance in prior years. It also had been observed to be operating beyond capacity.

¶ 7    The proposed location for the facility is not in a 100-year floodplain and has been operating as a refuse hauling company since 1999. There are no wetlands, archaeological or historical sites, presence of any threatened or endangered species, or wild or scenic rivers in the vicinity. The proposed facility is an 8000-square-foot transfer station with an approximately 6300-square-foot tipping floor. The building will have a drive-through loading pit and will include a scale house and three stormwater detention ponds. The trucks will have access to the proposed facility through Moen Avenue and will have two lanes of traffic. Collection trucks will enter the site and proceed to the scale house to be weighed. Afterward, collection trucks will proceed to unload in the transfer station or wait in the queuing area where the truck will be notified when it can proceed to the unloading area. Two trucks can unload at the same time.

Also, transfer trailers will enter the site and wait in the queuing area until they can proceed to the building.

¶ 8        The surface water management system is designed to control and manage runoff from developed areas for a 25-year, 24-hour storm event; manage a 100-year, 24-hour storm event; and control discharge from a 2-year and 100-year critical duration storm event. The plan will "improve the quality of stormwater runoff" from the proposed facility. All detention ponds have small outlet orifices, and the captured water takes over three days to be fully released from the detention ponds. All stormwater from the site drains to one pond equipped with a discharge pipe and a shut-off valve that can be closed in case of a spill at the site. The discharge pipe directs the water into a ditch on Moen Avenue that carries the water through underground drainage ways to the Des Plaines River. The drainage system is designed to meet Illinois and Will County requirements. The stormwater system will comply with the Will County Stormwater Management Ordinance (Stormwater Ordinance), including keeping peak detention water surface elevation below floor elevation. In particular, detention pond 1's "initial" floor elevation level was 571 feet mean sea level (msl) and its maximum floor elevation was 578 feet msl. Detention pond 1's peak elevation level was 577.93 feet msl for 100-year frequency and 573.06 feet msl for 2-year frequency.

¶ 9        The tipping floor and barrier walls will be cleaned with a pressure washer as needed and will be swept at least once every 24 hours. A fence will surround the property to control litter, and tarps will be used on loads. All roads and parking areas will be paved to control dust and mud. The site can accommodate up to 14 collection vehicles at a time, which will prevent backup onto Moen Avenue or on-site traffic. It will take about 5 minutes for a collection truck to enter the facility, dispose the waste, and exit the facility and take about 15 minutes to load a transfer

7

trailer. Attached to the application are full-size drawings of the proposed facility. The map of the proposed facility depicts traffic arrows and stop signs on the roadway to guide the trucks through the facility.

¶ 10    The proposed facility includes design and operational features intended to minimize the danger to the surrounding area from fire, spills, or other operational accidents. The incident prevention and response plan details fire, spill, and accident prevention and responses. The facility will have a safety officer, and the building is a "pre-engineered metal building" equipped with a sprinkler system. Employees will be trained, and equipment will be cleaned to remove any combustible waste. The facility will not accept liquid waste, and any liquid found on the tipping floor will be drained, processed, and discharged into a sewer system. No liquid from the tipping floor will be discharged into the stormwater management system. The proposed facility "may desire to accept more than 200 [TPD] of waste. The facility's Host Agreement with Will County indicates that a fee will be paid to Will County for every ton of waste accepted over 600 [TPD]." ERDS explained that the proposed facility would increase competition, increase operational flexibility, increase transfer capacity, reduce environmental impacts, and create an economic benefit for the village and Will County.

¶ 11    In March 2015, a hearing was held. The Village Board received 21 public comments from various individuals and companies. ERDS filed an "ERRATA" that included new calculations and corrections to the siting application. The hearing officer determined that the ERRATA was an amendment of the application and granted WMI and Will County (collectively, petitioners) additional time to review the amendment.

¶ 12    John Hock, vice president of Civil & Engineering Consultants, Inc., testified on behalf of ERDS. Hock testified that there was a shortfall of 850 to 2000 TPD in transfer station capacity

8

because Joliet Transfer Station's maximum average volume was 1300 TPD and it was currently generating 2400 to 3700 TPD. Hock stated that he had observed haulers being "cut off at times when waiting in line at the end of the day and not allowed to dump" at other sites. The proposed facility and its longer operating hours would provide an option for haulers in the service area. Hock detailed that he had reviewed transfer stations outside of the service area and opined that no other transfer station took waste to Prairie View RDF on a regular basis. He stated that ERDS will prevent clogging by incorporating features in the pipes that prevent clogging, performing preventative cleaning, and designing the system so that it continues to work properly even if clogging occurs. If the drains were to clog in detention pond 1, for example, the water will continue to flow into the pond until it reaches a certain elevation level. At that point, the water will not be able to flow into the pond and will flow "over the top of the trench drain and go down to detention pond 2, which is where it's intended to go to begin with." He also stated that freeboard would be included above the detention ponds to prevent "the movement and potential splashing or blowing from wind."

¶ 13        Hock also testified that 200 TPD is the "realistic initial volume" but that ERDS had the capacity to take more waste into its proposed facility:

> "Q. Mr. Hock, is 600 tons per day the maximum amount of waste that the site is proposed to receive on a daily basis?
>
> A. That is a throughput that we evaluated. We picked that number because it's a number that's in the host agreement with Will County that's subject to fees, so it seemed like a logical thing [to] evaluate.

9

We did not specify an exact maximum. In Illinois the IEPA does not require you to do that. So we are asking for flexibility that virtually every other transfer station has, that we will—your maximum tonnage is really dictated by the operations and by the facility itself.

So as long as you can meet all of the criteria in terms of getting it in and out and not having the material on the floor at the end of the night and transferring it all within the building, that's the criteria that is to be used.

I could—based on our evaluation there's many scenarios that we could adequately accept more than 600 tons per day. We may never get there, but, for instance, if you were taking relatively small amounts per hour over a large number of hours you could potentially exceed 600 tons per day, and we could do it well within the operational and design constraints of the facility.

\* \* \*

Q. So in other words, what we have now established is the applicant is requesting this Village to approve a solid waste transfer station with no specific throughput capacity?

A. Correct, I thought I had been very clear on that."

¶ 14　　　Hock modeled different traffic pattern scenarios with collection trucks and transfer trailers. In the models, Hock used ERDS's longest trailer and then considered other larger trailers

traveling through the facility. The models also included queuing of the trucks. However, Hock stated that queuing will not be necessary a majority of the time.

¶ 15    Hock testified that, in a higher throughput scenario, when 16 trucks could be trafficking the facility per hour, and even under 600 TPD, the facility would have 10 or fewer trucks moving through the facility at one time because it would take the trucks a relatively short period of time—six minutes—to enter, load/unload, and exit the facility. The proposed facility's entrance is 65 feet, while the Rockdale Transfer Station is 55 feet. Hock compared the entrance turn at other transfer facilities and the entrance turn at the proposed facility and concluded that the comparison had shown that the turn into other transfer facilities was more narrow than at the proposed facility and, therefore, "the transfer trailers can readily make all the required turns at the Moen Transfer Station."

¶ 16    Sheryl Smith, Kurt Nebel, and Andy Nickodem testified on behalf of WMI. Smith, an environmental consultant, opined that the proposed facility was not needed because (1) the Joliet Transfer Station had sufficient disposal capacity to meet the needs of Will County, (2) there was available capacity in or near Will County, (3) there were two transfer stations within 1.1 miles of the proposed facility, (4) transporting waste out of Will County to more distant landfills would be more expensive, and (5) Will County's SWMP stated that transfer station development must occur in the northern and eastern parts of the county.

¶ 17    Nebel, a WMI employee, testified that, in 2014, the Joliet Transfer Station accepted between 852 and 1800 TPD. He stated that sometimes 30 loads of waste were left on the tipping floor and discharged loads were partially outside the building. He also stated that WMI entered into a hauling contract that would add about 150 TPD to the volume at the station.

11

¶ 18    Nickodem, a civil engineer specializing in the design of solid waste facilities, opined that the proposed facility did not provide sufficient space for traffic delivering to and leaving from the proposed facility. Nickodem did not believe there was enough available space for queuing trucks and stated that the site was small and very crowded. He also stated that the stormwater management plan lacked sufficient detail to determine if the plan was adequate.

¶ 19    Nickodem prepared a written report on the proposed facility. He used a program called AutoTrack to recreate the proposed facility and track the movement of the trucks through the facility. The sizes of the trucks were based on the designs given in the application. Nickodem concluded that the transfer truck "uses up almost the entire [65-foot] entrance" to enter the facility and that the trucks would have to make a perfect turn to enter. The entrance is so narrow that, if other trucks are exiting the facility, the transfer trailers have to wait on Moen Avenue until the entrance is clear to enter the facility. This will cause potential traffic backups onto Moen Avenue. Furthermore, roll-off trucks are used to separate materials, and the roll-off boxes to dispose of the unacceptable waste are difficult to access.

¶ 20    Devon Moose, an environmental engineer, testified on behalf of Will County. Moose believed that the application had not provided sufficient detail to find the facility is necessary to accommodate the waste needs of the service area. Moose opined that a needs analysis is used to demonstrate the need for a facility and ERDS had not conducted this analysis. Moose stated that there were already three transfer stations in the area "all working under their allowed capacity" and believed it was difficult to demonstrate a need in the service area.

¶ 21    Moose opined that the proposed facility was too small and dangerous at 600 TPD. Specifically, Moose stated that the proposed facility would be unable to queue trucks as detailed in the application and that there was a lack of space on the tipping floor for sorting. Moose was

12

concerned with the traffic flow because the trucks would have to go against traffic, cross traffic, and head-on traffic to get to the facility and queuing area. Moose also testified that the stormwater management plan had "significant errors and problems" because there was no clogging analysis, swale analysis, or conveyance pipe analysis, the orifice drains were too small, and the detention basin was limited. He further opined that the design did not minimize danger to surrounding area from fire, spills, and other operational accidents because of the lack of detail in the application on storage, queuing, and flooding.

¶ 22        The hearing officer found that the Village Board had jurisdiction to review the application but that ERDS failed to meet criteria (i), (ii), and (v). The officer recommended adding special conditions to criteria (ii) and (v) in the siting approval.

¶ 23        Regarding criterion (i), the hearing officer determined that ERDS failed to meet the criterion because ERDS's evidence "contains no determination of the amount of waste requiring disposal that is or could be directly hauled to a landfill or some other transfer station and contains no calculation of transfer station capacity."

¶ 24        Regarding criterion (ii), the hearing officer found that the evidence showed that the risk for leachate from the proposed facility to the streets was "quite high." Also, there was no place for the transfer trailers and hauler trucks to operate at the same time.

¶ 25        Regarding criterion (v), the hearing officer found that the 65-foot entrance was too narrow and the trucks would have to execute a perfect turn to avoid hitting the gate. Also, the trucks would have more difficulty turning into the entrance depending on the weather. The transfer trailer's outbound lane crosses the inbound truck lane, which can cause backups and safety issues. The roll-off trucks would have difficulty locating the roll-off boxes. ERDS failed

13

to discuss how the storage of equipment on the property would not affect the traffic flow and inadequately explained traffic flow during the peak operations.

¶ 26    In September, the Village Board published ordinance No. 1026, conditionally approving the application. It found that the notice requirements were met and that ERDS met all of the criteria. It also found that ERDS met criteria (ii) and (v) subject to special conditions. The Village Board adopted all of the hearing officer's findings and conclusions except on criteria (i) and except (ii) and (v) regarding the special conditions.

¶ 27    Under criterion (i), The Village Board found that ERDS's evidence about improving transportation, environmental, and economic matters was properly considered under criteria (i). The Village Board determined that the application, Hock's testimony, and written public comments provided evidence that the proposed facility was necessary to assist the other transfer stations with the overabundant supply of materials. The Village Board did not find Smith's testimony persuasive because she was not an engineer or licensed in any profession and her testimony focused on whether a landfill is necessary. Smith testified that Citiwaste could provide transfer capacity without taking into account that Citiwaste does not take in general refuse. Smith believed that a transfer station was not necessary in the proposed location but did not know where the "population centroid," or center of the population, was located. She admitted that generation versus disposal capacity analysis is not the only valid way to demonstrate need. Furthermore, the Village Board also was not persuaded by the argument that ERDS needed to conduct a transfer capacity analysis for waste production and waste disposal capacities.

¶ 28    Under criterion (ii), The Village Board determined that Hock's testimony was "more thorough and credible" and, thus, ERDS presented evidence sufficient to prove criteria (ii), provided that ERDS complied with specified conditions. Those conditions included (1) a 300

14

TPD limit, (2) limiting the types of material accepted, (3) load checking, (4) running the proposed facility in accordance with the application, and (5) review and approval of the village engineer on the final design of the stormwater management system.

¶ 29　　　　Under criterion (v), the Village Board found that ERDS met its burden of proof, provided that it complied with specified conditions. Those conditions included (1) a 300 TPD limit with the potential to temporarily exceed the limit up to 600 TPD; (2) additional personnel to direct traffic; and (3) review and approval by the village engineer of the final site plan, traffic circulation design, signage, and plan of operation to minimize the danger from any traffic conflicts.

¶ 30　　　　In October, Will County and WMI filed separate petitions, requesting the Illinois Pollution Control Board to review the Village Board's decision. The Pollution Board accepted the petitions for review and consolidated the actions. The parties' petitions alleged that the siting application should not have been granted because (1) the Village Board had lacked jurisdiction to rule on the siting application, and (2) the statutory criteria (i), (ii), (v), and (viii) for siting a transfer station were not met. In April 2016, the Pollution Board found that (1) the Village Board had jurisdiction to review the siting application; (2) the amendment to the application was proper; and (3) the Village Board's decision on criteria (i), (ii), (v), and (viii) was not against the manifest weight of the evidence. Petitioners appealed the Pollution Board's decision to this court.

¶ 31　　　　　　　　　　　　　　　Appellate Proceedings

¶ 32　　　　This court issued an opinion in this case on July 5, 2018, unanimously affirming the decision of the Pollution Board approving the application of ERDS to locate a transfer station at a designated site in Will County. On July 26, 2018, appellant, WMI, filed a petition for rehearing

15

arguing that the Pollution Board had made insufficient arguments on which this court could base a reasoned decision.

¶ 33     After careful consideration of the petition, one member of the original majority was persuaded by its arguments and now dissents from the earlier opinion. The remaining panel members adhere to the original decision but have supplemented the analysis.

¶ 34     We deny the petition for rehearing but modify the majority opinion and incorporate the new dissent.

¶ 35                                    ANALYSIS

¶ 36                              I. Notice Requirements

¶ 37     Petitioners argue that ERDS did not comply with the notice requirements of section 39.2(b) of the Environmental Protection Act (Act) (415 ILCS 5/39.2(b) (West 2014)) because Hock's testimony that ERDS proposed a 600 TPD, and later an unlimited throughput, incorrectly described "the nature and size" of the proposed facility. Therefore, petitioners contend that the Village Board lacked jurisdiction to review the application. Respondents claim that the application proposed that the facility would handle an average of 200 TPD and that this statement was sufficient to notify interested persons about the nature and size of the facility in compliance with section 39.2(b). Furthermore, respondents assert that waste capacity is not relevant to the nature and size of the facility and, therefore, respondents did not violate the provision in section 39.2(b).

¶ 38     The requirements of section 39.2(b) must be followed in order for the county board to have jurisdiction to hear the proposal. *Maggio v. Pollution Control Board*, 2014 IL App (2d) 130260, ¶ 15. Section 39.2(b) states:

"No later than 14 days before the date on which the county board or governing body of the municipality receives a request for site approval, the applicant shall cause written notice of such request to be served either in person or by registered mail, return receipt requested, on the owners of all property within the subject area not solely owned by the applicant, and on the owners of all property within 250 feet in each direction of the lot line of the subject property ***.

*** 

Such notice shall state the name and address of the applicant, the location of the proposed site, the nature and size of the development, the nature of the activity proposed, the probable life of the proposed activity, the date when the request for site approval will be submitted, and a description of the right of persons to comment on such request as hereafter provided." 415 ILCS 5/39.2(b) (West 2014).

¶ 39     The purpose of section 39.2(b) is to notify interest persons about an applicant's intention to develop, in this case, a new transfer facility. *Tate v. Pollution Control Board*, 188 Ill. App. 3d 994, 1019 (1989). "The notice is sufficient if it is in compliance with the statute and it places potentially interested persons on inquiry about the details of the activity." *Id.*

¶ 40     In *Tate*, the petitioners argued that the county board lacked jurisdiction to review an application for the expansion of a landfill because the respondent failed to accurately describe the floodplain location, the facility's height expansion, or the facility's special waste activity. *Id.*

17

at 1017. The Fourth District explained that the statute did not specifically require that this information be included in the notice and concluded that the notice complied with the requirements of section 39.2(b). *Id.* at 1019.

¶ 41    In *Daubs Landfill, Inc. v. Pollution Control Board*, 166 Ill. App. 3d 778, 779 (1988), the Fifth District reviewed whether the county board lacked jurisdiction because the siting application inaccurately stated the legal description of the proposed landfill. The court stated that section 39.2(b) did not specifically require the legal description in a notice; rather, the section only requires the " 'location of the proposed site.' " *Id.* at 780 (quoting Ill. Rev. Stat. 1985, ch. 111½, ¶ 1039.2(b)). The court further explained that, although there was a discrepancy between the legal and narrative description, interested persons would have inquired about the discrepancy and would not have relied solely on the legal description. The court found that the narrative description of the proposed landfill alone provided interested persons with notice of the location of the proposed facility.

¶ 42    The Act requires that we construe this statute liberally. 415 ILCS 5/2(c) (West 2014) ("[t]he terms and provisions of this Act shall be liberally construed so as to effectuate the purposes of this Act"). Furthermore, we will not misinterpret the statute by reading into it exceptions, limitations, or conditions that the legislature did not express. *Petersen v. Wallach*, 198 Ill. 2d 439, 446 (2002). Similar to the courts' interpretation in *Daubs* and *Tate*, section 39.2(b) does not specifically require applicants to include the waste capacity of the facility within the notice. We do recognize that waste capacity is an important factor when considering section 39.2(a) criteria. See *M.I.G. Investments, Inc. v. Environmental Protection Agency*, 122 Ill. 2d 392, 401 (1988). Even with this acknowledgement, however, we believe interested persons received sufficient notice. ERDS stated that it would "handle an *average* 200 tons per

18

day of solid waste." (Emphasis added.) This put all interested parties on notice that the amount of TPD would vary. Similar to *Daubs*, it is unlikely that interested persons would have ignored the term "average" and would have relied solely on ERDS handling 200 TPD. Moreover, if any interested persons wanted to learn more about the waste amount, they could have inquired about it in the application, as the notice stated when ERDS would file the application and where it would be available for review. The application stated that the proposed facility "may desire to accept more than 200 [TPD] of waste." Thus, we find that the Village Board had jurisdiction to review the siting application.

¶ 43                                    II. Application Amendments

¶ 44        Will County claims that ERDS improperly amended the application twice in violation of section 39.2(e) of the Act (415 ILCS 5/39.2(e) (West 2014)). Specifically, Will County alleges that Hock's testimony that ERDS proposed 600 TPD, and later an unlimited throughput, were amendments to the application in violation of section 39.2(e), which permits only one amendment. Respondents assert that the application was only amended once in accordance with section 39.2(e) and that information about the 600 TPD and unlimited throughput was also included in the original application.

¶ 45        Section 39.2(e) states:

> "At any time prior to completion by the applicant of the presentation of the applicant's factual evidence and an opportunity for cross-questioning by the county board or governing body of the municipality and any participants, the applicant may file not more than one amended application upon payment of additional fees pursuant to subsection (k)." *Id.*

19

¶ 46    The application was only amended once in accordance with section 39.2(e). ERDS filed an "ERRATA," and the hearing officer determined it was an amendment to the application. Will County's argument that Hock's testimony was a second amendment in violation of section 39.2(e) is without merit because Hock's testimony regarding the 600 TPD and the unlimited throughput was also in the application. In particular, the application stated that the proposed facility "may desire to accept more than 200 [TPD] of waste. The facility's Host Agreement with Will County indicates that a fee will be paid to Will County for every ton of waste accepted over 600 [TPD]." Thus, we hold that ERDS did not violate section 39.2(e).

¶ 47                                    III. Conditions

¶ 48    Petitioners allege that the Village Board improperly imposed conditions under criteria (ii) and (v) when approving the application. In particular, petitioners claim that the Village Board adopted the findings and conclusions of the hearing officer's report, which stated that ERDS did not meet, *inter alia*, criteria (ii) and (v). Petitioners claim that the Village Board cannot place conditions on criteria it determined were not met because the plain language of section 39.2(a) states approval is granted only when all nine criteria have been met. Respondents assert that section 39.2(e) permits the board to impose conditions on siting approval.

¶ 49    Petitioners raise an issue of statutory interpretation. The primary objective of statutory interpretation is to determine and give effect to the legislature's intent. *People v. Jones*, 214 Ill. 2d 187, 193 (2005). The language within the statute must be given its plain and ordinary meaning. *Hadley v. Illinois Department of Corrections*, 224 Ill. 2d 365, 371 (2007). "Where the statutory language is clear, it will be given effect without resort to other aids of construction." *Id.* An issue of statutory interpretation is reviewed *de novo*. *Hamilton v. Industrial Comm'n*, 203 Ill. 2d 250, 254-55 (2003).

20

¶ 50    Section 39.2(e) states:

> "In granting approval for a site the county board or governing body
> of the municipality may impose such conditions as may be
> reasonable and necessary to accomplish the purposes of this
> Section and as are not inconsistent with regulations promulgated
> by the Board." 415 ILCS 5/39.2(e) (West 2014).

¶ 51    Section 39.2(e) states that the board may "impose such conditions *as may be reasonable and necessary to accomplish the purposes of this Section*." (Emphasis added.) *Id.* Thus, if the conditions will help ERDS meet the criteria, *i.e.*, accomplish the purpose of the section, then the board may impose them. In fact, the Fifth District found that conditions placed on a site approval supported the Pollution Board's finding that a criterion was met. *File v. D&L Landfill, Inc.*, 219 Ill. App. 3d 897, 908 (1991) (finding that conditions placed on site approval help to minimize incompatibility with surrounding area and, thus, the Pollution Board's finding that the criterion was met was not against the manifest weight of the evidence). Therefore, we hold that the Village Board's imposition of conditions was proper.

¶ 52                             IV. Section 39.2(a) Criteria

¶ 53    Petitioners contend that the Pollution Board's decision, affirming the Village Board's findings and consequently granting the approval of the siting application, was against the manifest weight of the evidence because ERDS had not met criteria (i), (ii), (v), and (viii) under section 39.2(a) of the Act (415 ILCS 5/39.2(a) (West 2014)).

¶ 54    Section 39.2(a) states:

> "(a) The county board of the county or the governing body of the
> municipality, as determined by paragraph (c) of Section 39 of this Act,

21

shall approve or disapprove the request for local siting approval for each pollution control facility which is subject to such review. An applicant for local siting approval shall submit sufficient details describing the proposed facility to demonstrate compliance, and local siting approval shall be granted only if the proposed facility meets the following criteria:

(i) the facility is necessary to accommodate the waste needs of the area it is intended to serve;

(ii) the facility is so designed, located and proposed to be operated that the public health, safety and welfare will be protected;

\* \* \*

(v) the plan of operations for the facility is designed to minimize the danger to the surrounding area from fire, spills, or other operational accidents;

\* \* \*

(viii) if the facility is to be located in a county where the county board has adopted a solid waste management plan consistent with the planning requirements of the Local Solid Waste Disposal Act or the Solid Waste Planning and Recycling Act, the facility is consistent with that plan; for purposes of this criterion (viii), the 'solid waste management plan' means the plan that is in effect as of the date the application for siting approval is filed[.]"

*Id.*

22

¶ 55      Although the board is required to review all criteria, the application is insufficient when one criterion has not been met. *Fox Moraine, LLC v. United City of Yorkville*, 2011 IL App (2d) 100017, ¶ 90. The reviewing court must not reweigh the evidence. *Id.* ¶ 88. It must be clearly evident from the record that the Pollution Board should have reached the opposite conclusion before a reviewing court reverses the Pollution Board's decision. *Peoria Disposal Co. v. Illinois Pollution Control Board*, 385 Ill. App. 3d 781, 800 (2008). "It has been held that a determination on the second criterion is purely a matter of assessing the credibility of the expert witnesses." *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 102. The Pollution Board's decision is reviewed under the manifest weight of the evidence standard. *Id.* ¶ 87 (citing *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 119 (2007)).

¶ 56                                          A. *Criterion (i)*

¶ 57      Petitioners argue ERDS had not met criterion (i) because (1) it failed to conduct a transfer capacity analysis of transfer stations serving the proposed service area to demonstrate a need for the proposed facility; (2) it failed to conduct a transfer capacity analysis of transfer stations serving the proposed service area but located outside of the area to demonstrate a need for the proposed facility; (3) it did not provide evidence that the proposed facility would increase competition, keep prices down, and efficiently transport waste to the Prairie View RDF; and (4) it did not provide a determinative amount of waste that would be directed to Prairie View RDF or another transfer station. Citing *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 110, respondents allege that ERDS does not need to show an "absolute necessity" for a new facility and, thus, a transfer capacity analysis is not necessary to find that it sufficiently met criterion (i).

¶ 58      Here, respondents have shown that the proposed facility is necessary to accommodate the waste needs of the service area. The evidence indicates that there were three transfer stations in

23

the service area and two were limited in the amount and type of waste they received. For instance, the Rockdale Transfer Station took only recyclables, and the Citiwaste Transfer Station took only clean construction and demolition debris, landscape waste, and recyclables. The Joliet Transfer Station is the only municipal solid waste transfer station in the service area. It was currently accepting more TPD than in its past years, and it was observed that the station had large amounts of waste on the tipping floor. Moreover, it had been observed cutting off trucks waiting in line, and consequently, the trucks were not allowed to dump. Nebel, a WMI employee, testified that sometimes 30 loads of waste were left on the tipping floor and discharged loads were partially outside the building. There was a capacity shortfall of 853 to 2046 TPD in the service area because the Joliet Transfer Station was currently generating more than double the amount of its average volume and it had been observed to be operating beyond capacity. Also, there are three landfills in the service area; however, the SWMP and the Prairie View RDF host agreement state that "as much waste as practical" in the service area should be disposed at Prairie View RDF. The amount of waste entering Prairie View RDF remained consistent from 2007 to 2011 but decreased by 30% from 2011 to 2013. Yet the population is expected to increase by 40% by 2040. The proposed facility will increase competition to the service area and increase transfer capacity. It will also provide benefits to the village of Rockdale pursuant to the host agreement, provide benefits to Will County as more waste will be disposed at Prairie View RDF, have longer operational hours than the Joliet Transfer Station, and reduce environmental impacts. Although Smith testified on behalf of WMI that the proposed facility was not a necessity, the Pollution Board considered that the Village Board did not find her arguments persuasive for the various reasons stated above, and credibility findings will not be reweighed. See *id.* ¶ 88.

24

Therefore, we determine that the Pollution Board's ruling that ERDS had met criterion (i) was not against the manifest weight of the evidence.

¶ 59　　　Petitioners' argument that ERDS failed to meet criterion (i) because it did not conduct a transfer capacity analysis of the transfer stations is unpersuasive. Respondents do not need to show "absolute necessity" for a new facility. *Id.* ¶ 110. Rather, respondents must show an "urgent need" for the facility and a "reasonable convenience of establishing it." *Id.* Respondents have demonstrated this in the evidence presented in the record.

¶ 60　　　The dissent states that, in relying on the Village Board's determinations, the Pollution Board ignored two errors in ERDS's application: (1) ERDS failed to calculate the disposal shortfall in accordance with the amount of waste generate by the entire service area, and (2) ERDS failed to take into consideration the disposal capacity of direct haul options and the capacity of existing transfer stations in the entire service area. The dissent reasons that this miscalculation is evidence that the Pollution Board did not conduct a thorough and independent analysis of the evidence as contemplated in *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 121 (2007), and therefore, this court could not review the Pollution Board's decision. We do not agree.

¶ 61　　　In the siting application (*supra* ¶ 6) and during John Hock's testimony (*supra* ¶ 12), ERDS explained that there was a disposal capacity shortfall between 853 to 2046 tons per day in the service area because the Joliet station was currently generating more than double the amount of its average volume. Although ERDS's calculations are specifically about the disposal capacity shortfall at the Joliet station, there is no indication that ERDS miscalculated the shortfall, as the Joliet station could be the only station with a shortfall in the area. Section 39.2(a)(i) of the Environmental Protection Act (415 ILCS 5/39.2(a)(i) (West 2016)) does not mandate that ERDS

show a disposal capacity shortfall at all the stations in the entire area; rather, it states that ERDS must demonstrate "the facility is necessary to accommodate the waste needs of the area it is intended to serve."

¶ 62       Here, the Pollution Board properly considered evidence that the proposed facility is necessary to accommodate the waste needs of the area it is intended to serve pursuant to section 39.2(a)(i) for two reasons. First, it was proper for the Pollution Board to consider the Village Board's decision, as the Pollution Board could not disturb the decision unless it was against the manifest weight of the evidence. *Peoria Disposal Co. v. Illinois Pollution Control Board*, 385 Ill. App. 3d 781, 800 (2008) (finding that the appropriate standard for Pollution Board is whether local siting authority's decision is against manifest weight of the evidence). Second, in its written decision, the Pollution Board wrote a lengthy discussion on the arguments of each party and the evidence and testimony that each party presented. The Pollution Board also addressed the evidence it considered sufficient to meet criteria (i) of section 39.2(a):

> "ERDS provided evidence regarding the disposal capacity of landfills in the service area. [Citation.] ERDS also provided a discussion in the application regarding the transfer stations in the area including Joliet Transfer Station and discussed the amount of waste accepted daily. [Citation.] The application listed transfer stations outside the service area and provided information on some of those facilities. *Id.* Additionally, Mr. Hock testified about his personal observations that the Joliet Transfer Station was overburdened and that at the current rate of generation there was a shortfall of transfer station capacity. [Citation.] ERDS also

26

provided evidence that the siting of the transfer station would offer

benefits.

Based on this record, the Board finds that the Village's

decision is supported by evidence in the record. Therefore, the

Board finds that the Village's decision is not against the manifest

weight of the evidence and affirms the Village's decision on

criterion I."

¶ 63   We agree with the Pollution Board that its decision is supported by the record. In addition to the Joliet station's disposal capacity shortfall, ERDS stated that the Joliet station was the only station that transferred municipal solid waste in the entire service area, that an overflow of waste was observed at the station, and that the station was cutting off trucks waiting in line to dump waste. Although the SWMP and Prairie View RDF host agreement states that as much waste as practical must be disposed of at Prairie View RDF, the amount of waste disposed of at the site decreased by 30% while the population is expected to increase by 40%. The proposed station would provide additional assistance in the area where the other stations do not accept municipal solid waste and where the Joliet station, the only station accepting municipal waste, is beyond capacity.

¶ 64                              B. *Criterion (ii)*

¶ 65   Petitioners claim ERDS had not met criterion (ii) because (1) it had not provided evidence that the stormwater management plan would safeguard the public from flooding in violation of the Will County Stormwater Ordinance, (2) the recorded peak water level in the detention system was not compliant with the Stormwater Ordinance, and (3) it had not provided evidence that the public will be safe from the traffic conflicts within the proposed facility.

27

¶ 66        Section 203.6, part F of the Stormwater Ordinance states: "Storage facilities shall be designed such that the existing conditions pre-development peak runoff rate from the 100-year, critical duration rainfall will not be exceeded assuming the primary restrictor is blocked." Under this section, petitioners allege that if the orifices within the detention ponds are clogged, stormwater will overflow and flood onto Moen Avenue.

¶ 67        The evidence revealed that the water management system is designed to control and manage runoff from developed areas for a 100-year critical duration storm event. ERDS planned to prevent clogging by incorporating features in the pipes that prevent clogging, to perform preventative cleaning, and to design the system so that it continues to work properly even if clogging occurs. If a drain were to clog, the pond would stop receiving water at a certain elevation level and water would be directed to detention pond 2, which discharges the water out of the facility.

¶ 68        Petitioners further assert that the Stormwater Ordinance requires that the peak stages of the detention system be below finished floor elevation. Petitioners argue that the lowest floor elevation is 571.00 feet mean sea level (msl) but that detention pond 1's peak water elevation is 577.91 feet msl. Also, petitioners argue that the Stormwater Ordinance requires one foot of freeboard above the design high water level and detention ponds 1 and 2 do not have the freeboard in the facility design.

¶ 69        However, Hock testified that freeboard will be included to prevent "the movement and potential splashing or blowing from wind." Also, the evidence shows that the *initial* elevation level is 571 feet msl while the *maximum* elevation level for detention pond 1 is 578 feet msl. The peak water elevation level from detention pond 1 is, therefore, below the maximum elevation

28

level, and petitioners have failed to show how the peak level being below the maximum elevation level did not meet the requirements of the design criteria within the siting application.

¶ 70    Also, the evidence shows that Hock presented different traffic scenarios using ERDS's largest collection truck model and a large transfer trailer model. The application revealed that the collection trucks' and transfer trailers' estimated activity time in the facility was relatively short and that the queuing area would prevent backup onto Moen Avenue and on-site traffic. Hock testified that, in a higher throughput scenario, the facility would have 10 or fewer trucks moving through the facility at one time because it would take the trucks a relatively short period to enter, load/unload, and exit the facility. Hock's comparison had shown that the turn into other transfer facilities was narrower than at the proposed facility and, therefore, "the transfer trailers can readily make all the required turns at the Moen Transfer Station."

¶ 71    Petitioners argue that the traffic conflicts within the facility are a threat to public safety because the 65-foot driveway is too narrow and will cause backup on Moen Avenue. However, section 39.2(a) does not require the elimination of all traffic problems but requires only a showing that "the traffic patterns to and from the facility are designed to minimize impact on existing traffic flows." In this case, respondents showed that the facility was designed to minimize the impact of existing traffic flows when Hock testified about the queuing areas and the relatively short activity time in the facility. Furthermore, the Pollution Board noted that the Village Board believed Hock's testimony was "more thorough and credible," and we will not reweigh the evidence. Therefore, we find the Pollution Board's decision that ERDS had met criterion (ii) was not against the manifest weight of the evidence.

¶ 72    C. *Criterion (v)*

29

¶ 73    Petitioners contend that ERDS did not meet criterion (v) because it failed to provide evidence that the proposed facility was designed to "minimize the danger from operational accidents arising out of on-site movements."

¶ 74    Under criterion (v), the focus is on safety "with the emphasis on planning to avoid or minimize the danger from catastrophic accidents." *Industrial Fuels & Resources/Illinois, Inc. v. Pollution Control Board*, 227 Ill. App. 3d 533, 547 (1992). "There is no requirement that the applicant guarantee no accidents will occur, for it is virtually impossible to eliminate all problems." *Wabash & Lawrence Counties Taxpayers & Water Drinkers Ass'n v. Pollution Control Board*, 198 Ill. App. 3d 388, 394 (1990).

¶ 75    The evidence reveals that the proposed facility includes design and operational features that will minimize the danger to the surrounding area from fire and spills. The incident prevention and response plan within the siting application details fire, spill, and accident prevention and responses. The facility will have a safety officer, and the building is a "pre-engineered metal building" equipped with a sprinkler system. Employees will be trained, and equipment will be cleaned to remove any combustible waste. The facility will not accept liquid waste, and any liquid found on the tipping floor will be drained, processed, and discharged into a sewer system. No liquid from the tipping floor will be discharged to the stormwater management system.

¶ 76    Furthermore, the evidence shows that the proposed facility will minimize the danger from operational on-site vehicle accidents. ERDS planned to hire a safety officer who will be responsible for implementing procedures to prevent operational accidents and coordinating responses to incidents or emergencies. The map of the proposed facility depicts traffic arrows and stop signs on the roadway to guide the trucks through the facility. Furthermore, the Village

30

Board placed certain conditions to help minimize any traffic conflicts, including adding additional personnel to direct traffic during peak hours and having the plan of operation to minimize the danger of traffic conflicts reviewed and approved by the village engineer. As we determined above, the Village Board may impose conditions necessary to accomplish the goals of section 39.2(a). Thus, we rule that the Pollution Board's decision that ERDS had met criterion (v) was not against the manifest weight of the evidence.

¶ 77                                    D. *Criterion (viii)*

¶ 78        WMI asserts that the application was not consistent with certain provisions in chapters four and five of the Will County SWMP that state a transfer station should be located in the northern and eastern parts of the county and that WMI is responsible for ensuring the development of transfer station networks to serve the county's needs in compliance with section 39.2(a)(viii). Respondents argue that the plan allows other companies to develop a transfer station network and that WMI does not have sole right to site a transfer station.

¶ 79        Chapter four, page four, of the Will County SWMP's 2001 update states, "Selected contractor may desire to site transfer stations in northern and eastern parts of the County." It also states, "One transfer station needed in both northern and eastern parts of the County." Chapter 5, page 17, of the SWMP requires that a new pollution control facility in Will County must negotiate a host agreement with the county before any determinations are made by the county.

¶ 80        Chapter 5, page 18, states, "The County will not pursue the development of a County-owned transfer station, rather the County will allow the private-sector to develop a transfer station network as it deems appropriate and pursuant to the terms of the Host and Operating Agreement for the Prairie View RDF." The Host and Operating Agreement for Prairie View RDF states, "Operator shall insure that such Interim and Final Disposal Facilities are combined

31

with a network of new and/or existing transfer facilities necessary and satisfactory to meet and address the ongoing solid and special waste disposal needs of the Will County Service Area over the term of this Agreement." WMI is listed as the operator in the agreement.

¶ 81 There is nothing in the record that shows that the application was not in compliance with the Will County SWMP. The provisions that WMI cites did not give WMI exclusive control to site a transfer station and do not limit the location of a transfer station to the northern and eastern parts of the county. Therefore, we hold that the Pollution Board's ruling that ERDS met criterion (viii) was not against the manifest weight of the evidence.

¶ 82                            V. Sufficiency of the Application

¶ 83 Lastly, petitioners argue that ERDS did not "submit sufficient details describing the proposed facility" in accordance with section 39.2(a) because the Village Board could not evaluate the criteria without an exact proposed waste throughput.

¶ 84 Section 39.2(a) explains that "[a]n applicant for local siting approval shall submit sufficient details describing the proposed facility to demonstrate compliance." 415 ILCS 5/39.2(a) (West 2014). Under section 39.2, it is important to show that a proposed facility is "reasonably required by the waste needs of the area, including consideration of its waste production and disposal capabilities." *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 110. As discussed above, we found that ERDS provided sufficient evidence of its waste production and disposal capabilities and that the Pollution Board's decision was not against the manifest weight of the evidence. Thus, we find that ERDS provided sufficient details to describe the proposed facility to comply with section 39.2(a).

¶ 85                                    CONCLUSION

¶ 86 The judgment of the Illinois Pollution Control Board is affirmed.

32

¶ 87    Affirmed.

¶ 88    JUSTICE WRIGHT, dissenting:

¶ 89    In this case, appellant, Waste Management of Illinois, Inc. (WMI), filed a petition for rehearing of our prior opinion pursuant to Illinois Supreme Court Rule 367(b) (eff. Nov. 1, 2017). Upon reconsideration, I now respectfully dissent and withdraw my prior concurrence. I understand the complications and frustrations arising from my decision to withdraw my support for an opinion that represented a unanimous decision from this panel on all issues.

¶ 90    I begin by focusing on the third contention addressed in the request for rehearing. With respect to criteria (i), the Pollution Board punted and blindly accepted the applicant's calculations, adopted by the Village Board. Had the Pollution Board conducted its own in-depth examination of the evidence of record, the Pollution Board would have recognized the shortfall of disposal capacity within the expansive tri-county service area was improperly calculated by the applicant's witness.[1]

¶ 91    I now conclude that there is a gaping hole in the evidence that the Pollution Board overlooked. The evidence gap arises from two errors. First, the applicant's evidence regarding purported disposal shortfall erroneously compared the total amount of waste generated by the entire service area to the limited waste disposal capacity of a single county, Will County. Second, the applicant's evidence regarding purported disposal shortfall ignored the disposal capacity of direct haul options and the capacity of existing transfer stations in the entire service area. Had the Pollution Board conducted its own in-depth analysis of the evidentiary basis for the applicant's conclusions about a shortfall, these errors resulting in incompetent evidence concerning the shortfall would have been discovered by the Pollution Board.

---

[1]This service area appears to be defined to include the applicant's customer base situated in Will, Grundy, and Kendall Counties and various isolated municipalities located in other counties.

33

¶ 92    Regardless, the Pollution Board's order does not reveal the specific numerical values of municipal solid waste generation and disposal capacity that the Pollution Board considered from the record before concluding a disposal capacity shortfall existed. This omission of the Pollution Board's precise factual basis for the conclusions regarding necessity makes an in-depth analysis of the Pollution Board's findings impossible.

¶ 93    In *County of Kankakee v. Pollution Control Board*, our court discussed the language of sections 39.2 and 40.1 of the Environmental Protection Act (Act). See 396 Ill. App. 3d 1000, 1007 (2009); 415 ILCS 5/39.2, 40.1 (West 2004). Our court wisely observed that "the *local* siting approval is just the first step *** in the process to approve or disapprove a siting application."(Emphasis in original.) *County of Kankakee*, 396 Ill. App. 3d at 1007. The Pollution Board completes the bifurcated administrative process that is necessary before judicial review of the conditional approval pertaining to this particular siting application. *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 121 (2007).

¶ 94    Based on my understanding of the carefully reasoned guidance from our supreme court in the holding of *Town and Country*, when one party disagrees with the first tier decision of the local siting authority, judicial review cannot take place until the Pollution Board steps in and *independently* makes a second tier determination based on the Pollution Board's independent consideration of the record. See *id.* at 120-121. I respectfully observe that, much like the often defended importance of judicial independence, the Pollution Board's independence is equally important to the siting approval process and should be strictly required and protected during the process of direct judicial review of the Pollution Board's order.

¶ 95    I write separately to point out that the familiar process of direct judicial review arising out of the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2016)) normally allows

34

our court to look backwards from the circuit court's decision and solely focus our review on the decision of the administrative agency. Typically, we do not review the conclusions of the first level of review in the circuit court. However, the statutory limitations for this court, based on the Act, create a different procedure. Here, our court does *not* glance backward to review the findings of the Village Board in this case, or any decision that preceded the Pollution Board's final administrative order in other cases. See *Town & Country Utilities, Inc.*, 225 Ill. 2d at 121-23; see also *County of Kankakee*, 396 Ill. App. 3d at 1004; *Peoria Disposal Co. v. Illinois Pollution Control Board*, 385 Ill. App. 3d 781, 800 (2008). Consequently, I have attempted to avoid looking back or indirectly reviewing the Village Board's findings as factual support for the Pollution Board's order.

¶ 96        The bifurcated approval process for a siting application is worthy of some discussion because the statutory scheme involves much legislative foresight. First, the lawmakers require the local authority to conduct the hearing on the siting application. To me, this makes good sense because the Pollution Board reviews the record created by a qualified hearing officer, on the local level, where live public commentary is most easily facilitated due to the location of the hearing. See *Town & Country Utilities, Inc.*, 225 Ill. 2d at 120; *Kane County Defenders, Inc. v. Pollution Control Board*, 139 Ill. App. 3d 588, 593 (1985).

¶ 97        Second, the lawmakers provided that a hearing officer conducting the local hearing must be "qualified." 415 ILCS 5/32 (West 2016). I presume the purpose of this provision is to ensure the hearing officer has experience in pollution control and/or legal training, as needed to develop a coherent and complete record for the Pollution Board to consider with a fresh eye. In this case, neither party took issue with the qualifications of the hearing officer, Derke J. Price. Neither

35

party criticized the fairness, neutrality, or basis for the hearing officer's findings that the Village should deny the siting application.

¶ 98        Next, with great insight, our lawmakers set forth detailed qualifications for the appointed Pollution Board members assigned the duty to review a local authority's siting decision. Specifically, the Act provides as follows: "[T]he Board shall consist of 5 technically qualified members, no more than 3 of whom may be of the same political party" and who "shall have verifiable technical, academic, or actual experience in the field of pollution control or environmental law and regulation." *Id.* § 5(a). Hence, the *final* credibility and competency decisions are *solely* entrusted to five individuals with diverse political backgrounds but common technical expertise.

¶ 99        In fact, the case law recognizes that the Pollution Board is best qualified to make the necessary and independent determinations of "what weight to give to the evidence" and "resolve any conflicts" in the evidence contained in the record. *Peoria Disposal Co.*, 385 Ill. App. 3d at 801. I contend that the interests of the entire tri-county service area, as defined by ERDS, are well served by assigning the resolution of the weight of the evidence and the resolution of conflicting evidence to the Pollution Board, rather than entrusting these very complex questions to a small village board within a large tri-county service area. Once the Pollution Board independently completes the second step in the siting process, the Pollution Board's final administrative decision becomes ripe for direct review by an appellate court of law.

¶ 100        Typically, a mixed question of law and fact decided by an administrative agency, such as the Pollution Board, would be judicially reviewed by this court using the clearly erroneous standard that pays great deference to the conclusions of the administrative agency. See *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 391-92 (2001).

36

However, the Act, enacted by the legislature, sets forth a different standard of judicial review. In fact, the legislature decided that "[a]ny final *order* of the Board under this Act *** shall be invalid if it is against the manifest weight of the evidence." (Emphasis added.) 415 ILCS 5/41(b) (West 2016). Reviewing courts have interpreted this statutory language to require a reviewing court to apply the manifest weight of the evidence standard to both the Pollution Board's independent factual findings and the Pollution Board's legal conclusions about the sufficiency of the evidence. See *Peoria Disposal Co.*, 385 Ill. App. 3d at 800-01. The Pollution Board's independent finding, subject to our review, is not present in the record. Instead, the Pollution Board arbitrarily adopted the findings of the Village Board. On this basis, the Pollution Board's determination that the Village Board's decision was correct was completely arbitrary, in my view. An arbitrary decision is always contrary to the manifest weight of the evidence. See *Best v. Best*, 223 Ill. 2d 342, 348-50 (2006).

¶ 101    I recognize the 40-page decision of the Pollution Board contains a lengthy recitation of the arguments based on each party's perspective of the evidence presented to the Village hearing officer before the Village Board rejected the hearing officer's recommendations. As stated above in paragraph 95, our court does *not* review the findings of the Village Board or even the Village hearing officer. See *Town & Country Utilities, Inc.*, 225 Ill. 2d at 121-23; see also *County of Kankakee*, 396 Ill. App. 3d at 1004; *Peoria Disposal Co.*, 385 Ill. App. 3d at 800. Consequently, the conflicting findings of the Village hearing officer and the Village Board that hired this particular hearing officer are irrelevant. I submit the arguments presented to the Village hearing officer during the local hearing should play no role in the Pollution Board's analysis now subject to our review in this appeal.

¶ 102    For this reason, I conclude the pages and pages of the summarized arguments presented to the hearing officer during the local hearing did not deserve a passing glance from the Pollution Board. Instead, the Pollution Board was required to independently determine the facts established by the manifest weight of the evidence. If those facts caused the Pollution Board to reach the same conclusion as the Village hearing officer, the conditional application should have been denied by the Pollution Board.

¶ 103    I reiterate that since the Village hearing officer and the Village Board reached opposite conclusions based on the same evidence and arguments, the Pollution Board had an independent duty to reweigh all of the evidence in the record. In so doing, the Pollution Board was required to determine whether the manifest weight of the evidence pointed to the conclusion reached by the Village's hearing officer or the Village Board. Unfortunately, a scavenger hunt is necessary to locate the scant, unsupported findings of the Pollution Board following a purported independent review of the manifest weight of the evidence introduced during the local hearing. These "findings" fill less than a page and a half of the 40-page decision. For the convenience of the reader, the sparse findings by the Pollution Board, scattered throughout the decision, are separately set forth below.

¶ 104                                    I. Criterion (i)

¶ 105    With respect to criterion (i), the Pollution Board finds as follows: "Based on this record, the Board finds that the Village's decision is supported by evidence in the record. Therefore, the Board finds that the Village's decision is not against the manifest weight of the evidence and affirms the Village's decision on criterion I."

¶ 106                                    II. Criterion (ii)

¶ 107    With respect to criterion (ii), the Pollution Board finds as follows: "The Board finds that the Village's decision is not against the manifest weight of the evidence. The Village weighed the credibility of the witnesses and found Mr. Hock more persuasive and credible. The Board does not reweigh the evidence; therefore, the Board affirms the Village's decision [on criterion (ii)]."

¶ 108                                    III. Criterion (v)

¶ 109    With respect to criterion (v), the Pollution Board finds as follows: "Mr. Hock testified that the design of the facility met criterion V and Mr. Moose disagreed. The Board does not reweigh the evidence. *** [T]he Board *finds that the Village's decision has support in the record* and therefore, the Board finds the Village's decision was not against the manifest weight of the evidence. The Board affirms the Village's decision on criterion V." (Emphasis added.)

¶ 110                                    IV. Criterion (viii)

¶ 111    With respect to criterion (viii), the Pollution Board finds as follows: "This evidence is sufficient for the Village to find that the siting of the transfer station is consistent with the SWMP. While WMI argues that the plan requires siting in only the eastern or northern parts of Will County, the record indicates that that [*sic*] provision applies only to a " 'selected contractor.' "

¶ 112    Based on the Pollution Board's skeletal, but independent findings reproduced above, I am troubled by two recurring themes. First, the Pollution Board consistently misstates the nature of the manifest weight of the evidence standard of review. Of course the Pollution Board does not reweigh the evidence because the Pollution Board must *first* weigh the evidence using the manifest weight standard.

¶ 113    It is disconcerting to me that the Pollution Board concludes, as set forth above, the Village's decision "has support in the record." *Some* evidence is not enough evidence to approve the pending conditional application. This is not a correct approach for the Pollution Board.

¶ 114    Second, after evaluating the evidence and drawing the hearing officer's own conclusions about credibility of the Village's witnesses, the Village's hearing officer recommended the applicant failed to meet the necessary requirement for the conditional application to be approved by the Village. The Village disagreed with the hearing officer's conclusions. Not surprisingly, the Village Board rejected the hearing officer's recommendation to deny the application. The Village justified the refusal to follow the recommendations of the hearing officer by finding their own witnesses more credible than any other witness. In this case, the Pollution Board was obligated to state its own reasoning concerning why the Village's witnesses were credible and the other witnesses were not. Further, the Pollution Board does not attempt to address or explain why the Village hearing officer's conclusions on competency and credibility were invalid and against the manifest weight of the evidence submitted to the hearing officer.

¶ 115    Due to this omission, the appellant has specifically requested this court to conduct a detailed analysis that includes a discussion of the differences between credibility and competency. I observe that credibility is a familiar legal concept describing the perceived truthfulness of a person testifying from the witness stand. See *Morgan v. Department of Financial & Professional Regulation,* 374 Ill. App. 3d 275, 288-89 (2007). On the other hand, competency is another equally familiar legal concept describing the ability of a witness to comprehend and truthfully discuss prior events. See *City of Chicago v. Bank of Ravenswood,* 93 Ill. App. 3d 52, 55 (1981).

¶ 116　　　Yet, "competency," as applied to a siting decision rendered by the Pollution Board, takes on a different meaning in my view. In the context of a siting decision, I believe the term "competency" describes the accuracy, reliability, or truthfulness of technical information contained in the record. Just as an incompetent witness should not be allowed to testify in a proceeding before the circuit court, incompetent evidence should not be considered by the Pollution Board in an administrative context. In my opinion, both credibility determinations of the witnesses and competency determinations of the information must be included and recited in the Pollution Board's independent determinations of fact.

¶ 117　　　However, due to the rubber-stamping rationale of the Pollution Board, the Pollution Board's *independent* credibility and competency determinations are simply not present in this record. Here, for reasons that are not apparent to me, the Pollution Board did not honor the bifurcated approval process. Instead, the Pollution Board took a shortcut by regurgitating the findings set forth in the Village Board's resolution. The Pollution Board did not conduct an in-depth analysis or closely examine whether the applicant's evidence was based on correct calculations of waste generated and the waste disposal capacity of the entire service area.

¶ 118　　　Simply stated, the Pollution Board failed to do its job in the case now before this court. Without independent, factually supported findings and determinations from the Pollution Board's perspective of the cold hard evidence, this court has nothing to review. For these reasons, I conclude the Pollution Board's rubber-stamping rationale resulting in conditional siting approval of this application must be set aside. Respectfully, I would reverse the Pollution Board's ruling on this basis without considering the merits of the other issues, including the insufficiency of the purported intentional and underestimated misinformation contained in the statutory notice.

41

¶ 119    For the reasons set forth above, I respectfully dissent from the modified opinion. I agree the request for reconsideration should be denied, after issuing the modified order, because the applicant has not raised any additional issues that were not originally addressed by the parties in the briefs or at oral arguments considered by this court.